JAMES WILSON, CHRISTOPHER RABORG AND PETER EISEN-
BURY, SURVIVORS OF THOMAS WILSON, *vs.* WILLIAM IN-
LOES, JOSHUA INLOES, JAMES HOOPER, AND JOHN L. CHAP-
MAN AND WIFE, HEIRS-AT-LAW OF JONATHAN CHAPMAN.
*December Term,* 1847.

If a tract of land call to begin at a bounded tree by the side of a branch, and
to run then course and distance to a *known* boundary, and the beginning tree
be lost, to find the commencement of the first line of the tract, you must
reverse the course and distance from the *known* boundary, and not elongate
nor shorten the line to the branch. The expression as to the branch being
merely descriptive of the general locality of the tree, and not an imperative
call, locating the spot where the tree stood; and it is no objection to this
rule, that by the reversal of the line, the beginning is shown to be in deep
navigable water, at a great distance from the shore, or where the lost begin-
ing could not have stood.

The leading object in the gratification of all calls is certainty in the location
of grants of land.

It is a general rule, that if there be a peremptory call to an object of length by
a course and distance line, and the object can be reached by gratifying the
distance, but violating the course; or by conforming to the course, and dis-
regarding the distance—the course must control the distance.

The word "by," when descriptively used in a grant, as in this case, does not
mean "in immediate contact with," but "near" to the object to which it
relates; and "near" is a relative term, meaning, when used in land patents,
very unequal and different distances.

The reason assigned for running lines of lands to the boundaries called for at
their terminations, instead of terminating them according to their courses and
distances, is not exclusively, that greater certainty, as to the termini of such
lines, is thereby attained; but also, because, thus locating grants, is more
beneficial to grantees; and because, it is a rule of construction in expound-
ing grants, to give them that interpretation, which operates most strongly
against grantors, and in favor of the grantees.

A deed or patent for a tract of land passes nothing, unless the land described
therein is susceptible of location; or, in other words, unless the survey
thereof can be made to close, either as to the whole conveyed, or some
definite part thereof.

If a tract of land be granted by *boundaries* only, without courses and distances,
if the beginning or any subsequent boundary be lost, and its original situs
cannot be proved, the entire tract is lost, and the grant thereby becomes
inoperative.

If a tract be granted by courses and distances only, without calling for any
boundary or object, save that, at the commencement of the first line, and it be

lost, and no proof can be adduced of the beginning or ending of *any* of its lines, the tract becomes a non-entity—the grant a nullity.

If a grant be made, not only with courses and distances, but with calls, it has a principle of self-sustentation, not possessed by grants with course and distance only, or with calls only.

Where a grant is by course and distance and calls, if the beginning, and any, or all the boundaries, *save one,* are lost and incapable of proof, the vitality of the grant still continues. This is the natural import of the express words of the grant.

It cannot be denied, that a valid survey or grant may be made without stating any natural object as being the *beginning* of its first line, if there be a boundary at the *termination* thereof.

It is no objection to the validity of a grant, that the place of its beginning is covered with water, whether navigable or otherwise; or that any of its lines run across such water.

In cases of grants of land, describing it by courses and distances and calls, the courts of this State have determined that, in locating them, they shall first be run by the calls; but if that be impracticable, they shall then be located by course and distance.

In an action of ejectment, the plaintiff, to prove the death of *O.* before the year 1745, without heirs, and intestate, offered in evidence a warrant of resurvey to *E. F.*, issued in 1725, a certificate of survey returned under such warrant, dated 21st September, 1726, but upon which no patent appeared to have been issued; and also an escheat patent relating to the same lands, granted 28th September, 1759, founded upon a special warrant of resurvey, dated 18th June, 1759, returned on the 30th of that month. The defendant objected to the admissibility of the warrant of resurvey to *E. F.* and certificate returned thereon, either with, or independent of the escheat patent of 1759, and proceedings, on which the same were founded. *Held,* the proceedings on that warrant not having been prosecuted, no purchase money being paid by *E. F.* nor patent accepted by him, neither the warrant nor certificate were proof of the facts recited in them, as to the death of *O.* at the time specified. Such statements were discredited, by the refusal of *E. F.* to consummate his title, and his omission or refusal to pay for the lands was evidence that he had discovered, that no title by escheat had devolved on the Lord Proprietary.

An exemplification of the return of the surveyor to a warrant of resurvey, dated 1707, with the depositions of witnesses, and inquisition of a jury called under the warrant of resurvey, executed on the 4th March, 1706-7—finding the beginning of a tract of land with its courses and distances, and other boundaries, recorded among the land records of *Baltimore* County, and certified under the seal of that County Court to be a true copy, is not evidence—because there existed, at the date of those proceedings, no law which authorized such proceedings to be recorded.

The proceedings in question were also inadmissible in evidence, because they purported to locate the tract of land described in them, in a way wholly inconsistent with the calls and expressions contained in its original patent.

Where a prayer called for an instruction to the jury, " that if they should find that the *beginning* of *B. V.* is not truly located on the plats by the defendant, then the plaintiffs are entitled to recover;" and it appeared that the *beginning of the tract claimed by them was admitted by the locations of both parties;* and that the patent for *B. V.* declared such *beginning* to be the *end* of its first line; and the bounded tree called for at the *beginning* of *B. V.* being lost, was to be found, *as a matter of law,* by reversing the course and distance of the first line of *B. V.,* the jury cannot find to the contrary,—and consequently the refusal to grant the prayer is not error.

By the act of 1745, ch. 9, the State granted no right which accrued to it subsequently to its passage.

An escheat grant by the State is no evidence of the existence of the facts constituting the escheat, anterior to the date of the warrant.

An escheat title accruing in 1759, will not entitle plaintiffs to recover, under the act of 1745.

A jury has no discretionary power to find, as matter of fact, that which is matter of law.

Expressions in a grant, intended merely as generally descriptive of locality, have not a conclusive and restrictive import.

By the grant of a tract of land, lying in *Chesapeake* bay, and on the *north* side of a river, called *P.,* and on the *north* side of the *north-west* branch of said river, beginning at a marked red oak, by a little branch, and running up along the north-west branch for breadth; it is not required that a tract—the *end* of whose first line was the *beginning* of the tract above described—should be located on the north side of the river *P.*

Where the witness had been surveyor of the county, (where land claimed is situated,) for *sixteen years,* and assistant of the county surveyor for many years previous, and testified that the beginning tree of a tract of land could not be found, that he had never heard of it, and had found the begining, by reversing the course and distance of the patent from another boundary—this is sufficient evidence of an endeavor, on the part of the party seeking to establish the *lost beginning,* to find the position of the same.

The jury is the proper tribunal to decide whether any and what variation ought to be allowed in the location of lands.

Whether any and what degree of allowance for variation should be made, are questions of fact to be determined by the jury on testimony upon that subject adduced to them in the trial of the cause.

If no such testimony be offered, the jury are not authorized to depart from the courses and distances expressed in the conveyances, by making any allowance for variation.

Where there is a total absence of the testimony in relation to variation, the court ought not to instruct the jury on that subject.

Where the court reverses the judgment of the County Court for error in instruction as to a question of variation of the compass, and perceives that by no allowance for such variation which the jury could rationally have made, the merits of the controversy could be affected, it will not award a procedendo.

Wilson *et al. vs.* Inloes *et al.*—1847.

Where a line calls to terminate at a bounded tree without any other reference, and the tree is lost, and there is no location or evidence to prove that where such line, run course and distance, terminates, is not and always has been high and fast land, the court will not instruct the jury that the line cannot be run into the water of a navigable stream. The court will not presume that the bounded tree may not have stood in navigable water.

Where the beginning tree of a tract is admitted upon the plats, both parties are estopped from denying its location.

Where the termination of a line of one tract imperatively calls for the beginning tree of another, and the tree so called for is admitted as the beginning tree, it is equally admitted as the terminus called for.

Where there is error in a patent, either in the description of the tree alleged to stand at the *beginning* of the first line of the tract, or in the boundary stated to stand at the end of that line, where these descriptions are irreconcilable, and one or the other must be rejected,—under such circumstances, the court will enquire into the probabilities of mistake, as to the boundaries called for, and look at the consequences which would result from rejecting the one or the other.

There is no difference between the weight to be ascribed to a call for a boundary, or matter of description thereof, when referred to as the beginning of a tract, or as the terminus of one of its lines.

In determining upon such probabilities, the court will examine the courses, descriptions, calls and boundaries of the title papers, to ascertain if the surveyor made any mistake therein—what evidence he had before him, and what he designed to do.

An error of description in a survey, adopted in a patent, manifestly founded in mistake or falsehood, is insufficient to control other calls and expressions inconsistent therewith.

Where the assumption of mistake in a single description, harmonizes all the rest of a patent, the court will make such assumption.

The designed non-disclosure of the fact to the Lord Proprietary or his agents, that a warrant of resurvey as executed was covered by navigable water, is not a fraud, and will not vacate a patent issued thereon.

The rights of piscary and navigation remain unimpaired by the grant of land covered by navigable water.

For a fraud practised on the Lord Proprietary, he only, or those subsequently claiming under him, have a right to complain. It is not a matter on which his patentees may claim to expand their rights.

To produce accordance between a line and its call, the running of the next preceding line cannot be changed; such changes would be in conflict with the grant.

APPEAL from *Baltimore* County Court.

This was an action of *ejectment*, and was before this court in 1840.—11 *G. & J.* 354. It was brought by the appellants

against the appellees, for all that piece or lot of ground, situate on *Fell's Point*, in the City of *Baltimore*;—beginning for the same at the south-west intersection of *Wilks* and *Eden* streets, and running westerly on *Wilks* street eighty feet; thence southerly, parallel with *Eden* street, crossing *Lancaster* street, to the water; then easterly with the water, and parallel with *Wilks* street, eighty feet, to *Eden* street; and thence northerly with *Eden* street, to the beginning, containing six acres, with the appurtenances, situate and being in *Baltimore* County aforesaid, which *James Wilson*, and *Thomas Wilson*, and *Christopher Raborg*, and *Peter Eisenbury* had demised, &c.

The defendants pleaded *not guilty*, and took defence *on warrant*, and upon return of the plats "for all the land lying between the *south* side of *Alice Anna* street, and the *north* side of *Lancaster* street, and the *west* side of *Eden* street and *Canal* street."

1st EXCEPTION. At the trial of this cause the plaintiff, to support the issue on his part, offered in evidence the plats and the explanations thereof, in this cause; and the following papers, to wit:

A patent to *Alexander Mountenay* of *Mountenay's Neck*, dated the 30th June, 1663.

An escheat patent of the same tract to *William Fell*, dated the 12th July, 1737.

A deed from *Edward Fell*, heir-at-law of *William Fell*, to *Thomas Sligh*, dated 17th August, 1758.

Deeds from *Sligh* to *Wiesenthal*; from *Wiesenthal* to *Cornthwaite*; from *Cornthwaite* to *David Brown*; from *Matthews*, attorney of *John Brown*, to *David Brown*; and, also, read in evidence the following agreement between the parties in this cause.

"We hereby agree that the present plaintiffs are the fee simple proprietors of the lot on the south side of *Wilks* street, as described in the deed from *William Matthews*, att'y for *John Brown*, according to its true location, and the defendants are the fee simple proprietors of the lots on west side of *Bond*

street, between *Alice Anna* and *Lancaster* streets, the leases of which they have located, and that the above admitted facts shall have the same effect, as if regularly proved before the jury."

. The grant to *Alexander Mountenay*, from the Lord Proprietary for two hundred acres, in *Patapsco* river, "*Mountenay's Neck*," described a parcel of land, called "*Mountenay's Neck*," lying in *Chesapeake* bay, and on the north side of a river, *Patapsco;* and on the north side of the north-west branch of the said river: beginning at a marked *red oak*, by a little branch, and running up along the north-west branch for breadth, west north-west one hundred perches, over a cove unto a marked *white oak*, by a line drawn north north-east; running into the woods for length three hundred and twenty perches, by a line drawn from the said north north-east line; running east south-east one hundred perches, by a line from the said east south-east line; running south south-west unto the first marked red oak, three hundred and twenty perches, laid out for two hundred acres, more or less.

The escheat patent to *William Fell*, for *Mountenay's Neck*, dated 12th July, 1737, contained the following recitals and description of the land, viz:

"Whereas, *William Fell* of *Baltimore* County, by his petition to our agents for management of our affairs within this province, did heretofore set forth that there was escheat unto us a certain tract or parcel of land called *Mountenay's Neck*, lying and being in the county aforesaid, originally, on the 30th June, 1663, granted unto a certain *Alexander Mountenay*, for two hundred acres, under old rent; that afterwards, on the 22d March, 1685, a certain *Samuel Wheeler*, and *Ann*, his wife, by their indenture of bargain and sale, conveyed the said land to a certain *David Jones*, who died thereof possessed, intestate, and without heirs, by which means, or for want of heirs of the said *Alexander Mountenay*, or regular conveyances from the first taking up the same, is become escheat unto us as aforesaid; and the petitioner being the first discoverer thereof, humbly prayed to be admitted to its purchase, be the same escheat by the means aforesaid, or by any other ways or means

whatsoever, and a special warrant to resurvey the same, with liberty of adding any vacant land that could be found thereto contiguous, and that upon return of a certificate of such re-survey, he paying our agent such reasonable price as should be agreed upon for the purchase of said escheat, and making good rights to the vacancy added, might have our letters patent of confirmation issue unto him thereon, which was granted him,—and accordingly, a warrant on the 14th April, 1737, to him for that purpose did issue. In pursuance whereof, it is certified into our Land Office, that the said tract is re-surveyed, by which it appears that the same contains the exact quantity of two hundred acres of escheat land, for which the said *William Fell* has paid and satisfied unto *Benjamin Tasher, Esq.*, our present agent and receiver general, for our use, the sum of £20 sterling, being the purchase money agreed upon for the said escheat, according to our instructions, bear-ing date at *Annapolis,* the 14th June, 1733, and registered in our Land Office of our said province. We do, therefore, in consideration thereof and other the premises, hereby give, grant and confirm unto him, the said *William Fell,* all that, the aforesaid tract or parcel of escheat land, now resurveyed and called *Mountenay's Neck,* lying and being in the county aforesaid: beginning at a bounded *white oak,* standing on the north side of the north-west branch of *Patapsco* river, and near the mouth of a small branch, descending into the north-west branch, which tree was bounded by Commissioners ap-pointed to examine evidences concerning the bounds of the same tract of land, at the place where the original beginning tree did stand, and running thence up the said north-west branch, and over the mouth of a cove west north-west one hundred perches to a bounded *red oak,* at or near the place whereat the second bounded tree did stand, thence north north-east three hundred and twenty perches, east south-east one hundred perches, and thence south south-west, (as expressed in the grant,) unto the beginning, containing and laid out for two hundred acres, more or less, according to the certificate of resurvey thereof, taken and returned into our Land Office, &c.

The deed from *Edward Fell* to *Thomas Sligh,* dated 17th August, 1758, described him as son and heir-at-law of *William Fell,* and was for *Mountenay's Neck,* in fee.

The deed from *Thomas Sligh* to *Charles Weisenthal,* of 25th July, 1760, was in fee, for all that part of a tract or parcel of land called *Mountenay's Neck,* contained within the following metes and bounds, courses and distances, namely: beginning for the part hereby bargained and sold at the beginning of that part of said tract of land, hereby conveyed by the said *Thomas Sligh* unto a certain *Peter Lettick,* and running thence bounding on the said part north twenty degrees and thirty minutes, east forty perches and three-quarters of a perch, then north sixty-one degrees and fifteen minutes, east fifty-eight perches, unto the end of the north thirty-six degrees, west eighteen perches line of four acres, part of the aforesaid tract of land heretofore conveyed by the aforesaid *Thomas Sligh* unto a certain *Brian Philpot,* then bounding on that part, another part of said tract of land conveyed by the said *Sligh* to the said *Philpot,* until it intersects the first line of the whole tract called *Mountenay's Neck,* then bounding on that line east south-east sixty-four perches, unto the end of the south thirty-two degrees, east twenty-two perches and half a perch line of that part of said tract of land now in possession of a certain *Captain Thomas Hammond,* and then bounding on that part and the aforesaid part sold by the said *Thomas Sligh* to the aforesaid *Peter Lettick,* according to the several courses thereof unto the beginning aforesaid, containing eleven acres, more or less; together with, &c.

The deed from *C. Weisenthal* to *John Cornthwaite* of 7th December, 1775, was similar to that from *T. Sligh* to *C. W.*

The deed from *John Cornthwaite* to *David Brown,* of 8th July, 1782, was for all that piece or parcel of ground on *Fell's Point,* being a part of a tract of land called and known by the name of *Mountenay's Neck,* and lately annexed to *Baltimore Town,* and now called the *South-east Addition:* beginning at the intersection of *Wilks* street and *Eden* street, and running and bounding on *Wilks* street, west eighty feet; thence south,

parallel with *Eden* street to the first line of *Mountenay's Neck*, thence bounding on said line reverse, east south-east to *Eden* street, thence bounding on *Eden* street north to the beginning; together, &c. for ninety years renewable forever.

The deed from *William Matthews, attorney in fact for John Brown*, of *Philadelphia*, to *David Brown*, dated 23d December, 1793, was for the land described in the deed from *Cornthwaite* to *David Brown*, and was in fee.

And the plaintiffs further read in evidence the ordinance of the Mayor and City Council of *Baltimore*, passed the 11th March, 1823, entitled "An Ordinance for the improvement of the Cove," (and which ordinance and all the acts of Assembly in these exceptions referred to, it is admitted, may be read from the printed collections of ordinances and of acts of Assembly;) and also the following acts of Assembly, to wit: the act of 1745, (August session,) ch. 9; the act of 1773, ch. 4, (June session;) the act of 1784, ch. 39, (November session;) and further gave evidence, by *Alexander J. Bouldin*, the surveyor of *Baltimore* County, and by *James W. Collins, James Tracy* and ——— *Aler*, that the piece of ground claimed by the plaintiffs in this cause, together with nearly all the ground between, that is designated on the plat, between *Wilks* street and *Lancaster* street, and between *Caroline* street and *Harford* street, was filled up, and made fast land, under the before-mentioned ordinance of 1823; and that the piece of ground, claimed in this suit by the plaintiffs, was fast land, and enclosed in March, 1837; and also proved by said *Collins* and said *Bouldin*, that the water of the City Dock, as laid down on the plat is, and so far as they can remember for a number of years, has been deep and navigable; and the said *Bouldin*, in answer to a question on part of the defendants, whether he had ever heard of any other place as the beginning of "*Mountenay's Neck*," than that located for it on the plats? The said *Bouldin* said that he had heard that "*Mountenay's Neck*" was supposed to begin at H, or thereabouts; and the said plaintiffs also gave in evidence the plat of the addition to *Baltimore Town*, made under said act of 1773, ch. 4, and proved

that the same embraced " *Mountenay's Neck*," so far as the same was then fast land, and the ground, (northward of *Wilks* street, and of the improvement now claimed,) then in those under whom the plaintiffs claim.

And thereupon, the defendants, to prove the issue on their part, offered in evidence the following patents, to wit: of " *Bold Venture*," granted to *John Oulton* on the 20th March, 1695; of " *Long Island Point*," granted to *William Poultney*, 10th July, 1671; of " *Island Point*," granted to *William Fell* on the 5th June, 1734.

The patent to *John Oulton*, granted 20th March, 1695, was for all that tract or parcel of land called " *Bold Venture*," lying on the north side of *Patapsco* river, and on the north side of *Whetstone Branch*, beginning at a bounded white oak, standing by the branch side—it being a bound tree of *Poultney's Point*, and running thence north north-east fifty-eight perches, to a bound red oak of *Mountenay's Neck;* then with *Mountenay's* land, west north-west one hundred perches, to a bound white oak of *Mountenay's;* then with *Mountenay's* long line north north-east three hundred and twenty perches; then west north-west fifty-four perches; then south south-west three hundred and twenty perches, to a bound ash; then south south-west two degrees, southerly twenty-four perches, to the river side; then down the river, south south-east two degrees easterly, eleven perches; then south south-west two degrees, southerly twenty-four perches; then with a direct line to the first tree, containing, and now laid out for one hundred and sixty-one acres of land, more or less, according to the certificate of survey thereof, taken and returned into our Land Office, bearing date the 23d December, 1695, and there remaining, together, &c.

The patent to *William Poultney* was dated 10th July, 1671, and was for all that parcel of land, called " *Long Island Point*," lying in *Baltimore* County, on the north side of *Patapsco* river, and on the north-west branch of the river— beginning at a bounded locust, standing at the head of a round bay, and running down the said bay south south-west eighty

perches, to a bounded *Spanish* oak at the mouth of the said bay, and from the said oak, up the said branch north-west thirty-six perches; then west south-west one hundred perches; then west north-west seventy-two perches, to the bottom of " *Long Island Point;*" then north north-east sixteen perches; then east and by south sixty perches; then north and by east eighty perches, *to a bounded red oak of a parcel of land, laid out for Alexander Mountenay;* then north north-east by *Mountenay's* land seventy-six perches, and then to the first bounded tree, containing, and now laid out for one hundred acres of land, more or less, together, &c.

The patent to *William Fell* was as follows:

CHARLES, &c.   Know ye, that whereas *Charles Carroll,* of the City of *Annapolis,* in *Anne Arundel* County, Chirurgeon, by his humble petition to our agent for management of land affairs within this province, did heretofore set forth, that a certain *William Poultney,* of *Baltimore* County, deceased, was possessed of a tract of land, called " *Island Point,*" situate on a branch of *Patapsco* river, granted unto the said *Poultney,* for one hundred acres, by patent, bearing date 10th July, Anno Domini, 1671, and died thereof possessed, Anno 1674; and although an alien, made a will, and devised the same to *Edward Monfrett,* likewise an alien, in the words:

Item.   " I give and bequeath unto *Edward Monfrett,* of *Patapsco,* all my lands, goods and chattels," whereby the said *Monfrett,* as the petitioners conceived, had but an estate for life; although that he, the said *Poultney,* was capable of devising the said land,—and that after the decease of the said *Monfrett,* the said land would come to the heirs of the said *Poultney;* but so it was, that no heirs of the said *Poultney* or *Monfrett* had since appeared to claim the said land; by means whereof, or some other causes before set forth, the petitioner conceived the same become escheat unto us as aforesaid; and inasmuch as the petitioner had been the first discoverer, prayed to be admitted to its purchase, and a special warrant to resurvey the same, with liberty of adding what vacant land could be found to the same contiguous; and that upon return

of a certificate of such resurvey, he paying our agent such reasonable price as should be agreed upon for the purchase of said escheat, and complying with all other requisites, according to our conditions of plantation then in force, might have our letters patent for the whole, be the said "*Island Point*," escheat by means aforesaid, or any other, which was granted him.    And accordingly, a warrant on the 12th September, 1733, to him, for that purpose, did issue.    In pursuance whereof, it is certified into our Land Office, that the said tract is resurveyed, by which it appears that the whole now contains the quantity of eighty-five acres; whereof fourteen acres is vacant land added, for which said escheat and vacancy, the said *Charles Carroll* has, according to our instructions to *Edmund Jennings, Esq.*, our present Judge of our Land Office, bearing date at *Annapolis*, 14th June, 1733, paid and satisfied unto *Daniel Dulany, Esq.*, our present agent and Receiver General, for our use, as well as the sum of £7 sterling, being one-third part of the value set on the said escheat, as also the sum of 6 shillings sterling, for the rights to the vacancy added; but before our grant thereon to him did issue, he, the said *Charles Carroll*, did, on the 4th June, 1734, for a valuable consideration, assign, sell, transfer and make over unto *Wm. Fell*, of *Baltimore*, his heirs and assigns forever, all his right, title and interest of, in and to the said land, and the certificate thereof, who has supplicated us that our letters patent of confirmation may now issue unto him, which we have thought fit to condescend unto; and we do, in consideration thereof, and other the premises, hereby give, grant and confirm unto him, the said *Wm. Fell*, all that, the aforesaid tract or parcel of escheat land, with its vacancy added, now resurveyed, and still called "*Island Point*," lying and being in *Baltimore* County, beginning at a bounded white oak, standing at the head of a round bay, on the north-west branch of *Patapsco* river, said oak standing by the spot where it is supposed stood a bounded locust, the ancient beginning tree of the said land: same white oak being north four degrees, east sixty-six perches from the mouth of the said bay, and running from the aforesaid white

oak, south four degrees, west sixty-six perches, thence south sixty-three degrees, west fourteen perches, thence north forty degrees, west thirty perches, thence north eighty-seven degrees, west forty-two perches, thence south fifty degrees, west fifty-six perches, thence south seventy-three degrees, west twenty-four perches, thence north fifty-five degrees, west fifty-four perches, thence north forty-five degrees, east sixteen perches, thence south eighty degrees, east sixty-four perches, thence north three degrees, east eighty perches, thence north north-east seventy-six perches, and thence by a straight line to the said beginning, containing and now laid out for eighty-five acres of land, more or less, according to the certificate of resurvey, thereof taken and returned into our Land Office, bearing date the 20th February, 1733, and there remaining, together, &c.

And proved, that they were truly located on the plats ; and further proved by said *Bouldin*, surveyor of *Baltimore* County, that the beginning tree of "*Bold Venture*," could not be found ; that he had never heard of any such tree, and *that he found the beginning of "Bold Venture" in the defendant's location, by reversing the first line from the admitted beginning at M, of "Mountenay's Neck."* And also proved by said *Bouldin*, that the lot to which the improvement in the case is claimed as an appurtenance or extension, was not included within the lines of the addition to *Baltimore Town*, as laid out under the act of Assembly aforesaid, of 1773—said addition extending only to the lands on the banks of the river, as located on the plats in this cause, from black A to Z. And that witness had been surveyor of the county for sixteen years, and was his father's assistant for many years, who was also for some twenty years the surveyor of *Baltimore* County. And the defendant also proved, that in 1783, the water ran as marked on the plats with blue shaded lines, from A to B to C to D, and in 1801, by the shaded line from G to H to I to J and to K. And the defendant further read in evidence the ordinance of the Mayor and City Council of *Baltimore*, passed the 4th May, 1841, entitled " An Ordinance to grant permission to certain persons

to extend their lots from *Wilks* street and *Bond* street, unto the water."

The plaintiffs thereupon further to support the issue on their part, and *to prove the death of John Oulton* before the year 1745, without heirs and intestate, offered in evidence the warrant of resurvey to *Edward Fell*, granted in the year 1725, and the certificate thereon and in connection therewith, for the purpose of proving the death of said *Oulton*, without heirs and intestate, as aforesaid, offered to read in evidence the warrant, certificate and patent of "*Rogers' Inspection;*" which warrant, certificate and patent are as follows, to wit:

"*January 8th*, 1725.    Whereas, *Mr. Edward Fell*, of *Baltimore* County, by his humble petition to his Lordship's agent for the management of land affairs within this province, has set forth, that there is escheat unto his Lordship, a small tract or parcel of land, lying and being in *Whetstone Branch*, now called *North-west Branch*, in *Baltimore* County aforesaid, called the "*Adventure*," containing one hundred and sixty one acres, originally, on the 20th March, Anno Dom. 1695, granted to *John Oulton*, who died thereof possessed, intestate and without heirs, by which means the same became escheat as aforesaid; and the petitioner, being the first discoverer thereof, prayed to be admitted to its purchase, and a special warrant to resurvey the same; and that upon return of a certificate of such resurvey, he might have his Lordship's letters patent of confirmation issue unto him for the same, which is granted him; provided he pay unto his Lordship's agent such reasonable price as shall be agreed upon for the purchase thereof; comply with all requisites, and finally sue out his Lordship's letters patent of confirmation thereon, within two years after date hereof.

"Lay out therefore, for, and carefully resurvey, and in the name of him, the said *Edward Fell*, the aforesaid tract of escheat land, according to its ancient metes and bounds, including surplus; and by your outlines, adding what vacancy you can find to the same contiguous, whether cultivated or otherwise, not running your lines, &c."

BALTIMORE COUNTY. By virtue of a special warrant of escheat, granted unto *Edward Fell*, of *Baltimore* County, out of his Lordship's Land Office, bearing date January 8th, 1725, as appears, &c. These are therefore to certify, that I, *Richard Gist, deputy surveyor under Thomas Addison, Esq., surveyor general of the Western Shore of this province,* have resurveyed for him, the said *Edward Fell,* a parcel of land formerly called, "*Bold Adventor,*" and now called "*Fell's Footing,*" lying in *Baltimore* County, on the north side of *Patapsco* river: beginning at a bounded red oak, standing at the end of the west north-west line of the land formerly laid out for *Alexander Mountenay;* it being the beginning boundary of the land called "*Folly,*" and "*Cole's Harbor;*" this day surveyed for *Mr. Edward Fell* of this county; and runs thence south sixty-seven degrees, thirty minutes, east nineteen perches; thence south thirty-seven degrees, west six perches; thence north fifty-six degrees, west twenty-eight perches; then west twenty-three perches; thence north forty-five degrees, west six perches; thence north thirty-two degrees, west thirteen perches; thence north fifteen degres, east nineteen perches; thence by a direct line to the first boundary, containing and now laid out for four and three-quarters acres of land, more or less; to be holden of the manor of *Baltimore.*

Surveyed, September 21, 1726.

Per RICHARD GIST, *Dep'ty Surv'r.*

"*Fell's Footing*" contains four and three-quarter acres, pr scale thirty ps in an inch. This tract is all cleared and *worne* out, and without any improvement, except about thirty *auld fence loggs.*                                  J. ROSS, *Ex'r.*

Examined and passed.

*April* 27, 1759. Whereas, *William Rogers,* of *Baltimore* County, by his humble petition to his Lordship's agents for management of land affairs within this province, did set forth, that a certain *John Boreing* had, on the 20th April, 1742, surveyed and laid out for him a tract or parcel of land, called "*Boreing's Convenience,*" lying and being in the county afore·

said, containing seventy-five acres, by virtue of an assignment for that quantity from *Thomas Sheredine*, being part of a warrant for four hundred acres, granted said *Sheredine* the 24th Oct., 1741, as per the certificate thereof returned into the Land Office, might appear.   The petitioner further showed, that the said certificate had laid ever since in the office postponed, and no patent had ever yet issued thereon; and as the two years for suing out such grant was expired, the petitioner was advised, that by sundry of his Lordship's proclamations published, the certificate aforesaid was become null and void; and the land and premises therein mentioned subjected to the benefit of the first discoverer, &c.   Inasmuch as the petitioner was the first discoverer, and desired to take up and pay for the same, humbly prayed a special warrant to resurvey the aforesaid tract, with liberty of adding any contiguous vacancy; and that on return of a certificate of such resurvey, he paying the caution money and complying with all other requisites usual in such cases, might have his Lordship's grant issue unto him thereon, which was granted him; provided, he sues out such grant within two years from the date hereof.   Lay out therefore, and carefully resurvey, for, and in the name of him, the said *William Rogers*, the aforesaid tract or parcel of land, according to its ancient metes and bounds; nevertheless, correcting and amending any errors in the original survey; and by your outlines, adding any vacant land you can find thereon contiguous, whether cultivated or otherwise, not running your lines, &c. Renewed in folio 240.   18th June, 1759.   Whereas, *William Rogers*, of *Baltimore* County, had on the 27th April last, granted him a special warrant on the proclamation for the effecting and securing a tract of land, called "*Boreing's Convenience*," as in folio 175 appears; but the said warrant, not being yet executed, *it is this day renewed and continued in force for six months longer from the date hereof, with liberty of including an escheat tract, called "Bold Venture," contiguous to the former tract, originally granted unto a certain John Oulton, for one hundred and sixty-one acres, who died seized thereof, intestate, and without heirs, by which means the same became*

*escheat to his Lordship;* and forasmuch as the petitioner was the first discoverer, and desired to purchase the aforesaid tract, be it escheat by the means aforesaid, or by any other ways or means whatsoever.

Signed per order,        THOS. JENNINGS, *Cl'k.*

BALTIMORE COUNTY, *ss.* By virtue of a special warrant granted out of his Lordship's Land Office, on the 27th April, 1759, to resurvey for *William Rogers*, of *Baltimore* County, a tract or parcel of land called "*Boreing's Convenience;*" on the 20th April, 1742, surveyed and laid out for a certain *John Boreing*, for seventy-five acres, who never sued out a grant thereon; and by outlines, to add any vacant land thereto contiguous, whether cultivated or otherwise; which warrant not being executed, it was on the 18th June, 1759, renewed, and continued in force for six months longer from that day, with liberty of including an escheat tract, called "*Bold Venture*," lying and being contiguous to the above mentioned tract, originally, on the 20th March, 1695, granted unto a certain *John Oulton*, for one hundred and sixty-one acres; who died seized thereof, intestate, and without heirs, by which means the same became escheat. I, *Nicholas Ruxton Gay*, deputy surveyor of *Baltimore* County, have carefully resurveyed and laid out for, and in the name of him, the said *William Rogers*, the two aforesaid tracts or parcels of land, according to their ancient metes and bounds: beginning for "*Boreing's Convenience*," at, &c. Beginning for "*Bold Venture*," south south-west fifty-eight perches, distant from a bounded post, set in the ground, where it was formerly proved a bounded red oak, the beginning tree of a tract of land called "*Mountenay's Neck*," did originally stand; and running thence north north-east fifty-eight perches, unto the said beginning post of *Mountenay's Neck;* then with that land, as expressed in the original certificate of "*Bold Venture*," west north-west one hundred and thirty-two perches, unto a bounded *white oak* of said land; then still with said land, (as likewise expressed in the certificate of *Bold Venture*,) north north-east three hundred and

18    v.6.

twenty perches; then west north-west fifty-four perches; south south-west three hundred and twenty perches; south twenty degrees and thirty minutes, west twenty-four perches; south twenty-four degrees and thirty minutes, east eleven perches; south twenty degrees and thirty minutes, west twenty-four perches; and then with a straight line to the place of beginning, containing and laid out for one hundred and seventy-three acres and the fourth part of an acre, more or less; one hundred and fifty-two acres and the fourth part of an acre, part whereof lyeth in elder surveys and *navigable water.*

I also certify, that I have excluded such part of *Boreing's Convenience,* as lyeth in elder surveys, and such part of *Bold Venture, as lyeth in elder surveys and navigable water ;* and have added to the residue of said tracts of land, the quantity of five acres of other vacant land; *but forasmuch as elder surveys and navigable water cut the tract called "Bold Venture" into two parts,* I cannot reduce the whole into one entire tract, as by the warrant I am commanded; for which reason I have reduced all the part of the tract of land called "*Boreing's Convenience,*" clear of elder surveys, with five acres of other vacant land, and eighteen acres and one-fourth part of an acre, part of the escheat tract thereto contiguous, into one entire tract; and the remaining two acres and three-quarters of an acre, part of the aforesaid escheat tract, which lies clear of elder surveys and navigable water, into another separated tract, both bounded as follows, *viz*: lying in *Baltimore* County, on the north-east side of the north-west branch of *Patapsco* river: beginning for the first mentioned part in the east line of a tract of land called "*Todd's Range,*" and where the said east line of "*Todd's Range*" intersects the west side of "*Jones' Falls ;*" and running thence, bounding on and with the said east line of "*Todd's Range,*" east one hundred and ninety-eight perches, until it intersects the south south-west three hundred and twenty perches line of the original escheat tract called "*Bold Venture ;*" then bounding on and with that line south south-west twenty-nine perches, until it intersects the east line of a tract of land called "*Cole's Harbor ;* then bounding on

and with that line of "*Cole's Harbor*," east sixty perches, until it intersects the north north-east three-hundred and twenty perches line of a tract of land, called "*Mountenay's Neck*;" thence bounding on that line to the end thereof, north north-east forty-four perches; then west north-west fifty-four perches, unto the end of the west north-west fifty-four perches line of the original escheat tract, called "*Bold Venture*;" then south south-west twenty perches, until it intersects the east one hundred and eighty-one perches line of a tract of land called "*Garron Barrow*;" then bounding on that line reverse of the same, west one hundred and twenty-two perches, unto the end of the south six degrees, west thirty-seven perches line of the said land; then bounding on that line reverse of the same, north six degrees, east twenty-nine perches and three-quarters of a perch, until it intersects the east line of a tract of land called "*Hanson's Wood Lot*;" then bounding on that line reverse of the same, west twenty-one perches and half a perch, until it intersects the south by west line of a tract of land called "*Salisbury Plains*;" then bounding on and with that line to the end thereof, south by west thirty-nine perches; then bounding on and with the given line of "*Salisbury Plains*," north forty-one degrees and thirty minutes, west ninety-one perches and half a perch, until it intersects the given line of a tract of land called "*Lunn's Lot*;" and then with a straight line to the place of beginning, containing and laid out for fifty acres and the fourth part of an acre, more or less. Beginning for the other part at a bounded white oak, standing near the side of the north-west branch of *Patapsco*, it being *the second bounded tree* of a tract of land called "*Mountenay's Neck*;" and running thence bounding on the said land east south-east seventy-one perches, unto a creek of the said north-west branch; then bounding down with the said creek south twenty degrees, west seven perches, unto the mouth of said creek; then bounding upward on said north-west branch the four following courses, *viz:* north fifty-eight degrees, west thirty-five perches; south eighty degrees, west sixteen perches; north seventy-four degrees, west ten perches; north

thirty-three degrees, west twenty perches, and then with a straight line to the beginning, containing and laid out for two acres and three-quarters of an acre, more or less, and containing and laid out in the whole in both the aforesaid parts for fifty-three acres, more or less, to be held of the manor of *Baltimore*, by the name of *"Rogers' Inspection."* June 30, 1759.

N. RUXTON GAY, *D. S. B. C.*

A is the beginning of *"Boreing's Convenience."*

B *is the beginning of "Bold Venture."*

C is the beginning of one of the parts of the resurvey, containing $50\frac{1}{4}$ acres.

D is the beginning of the other part of the resurvey, containing $2\frac{3}{4}$ acres.

| | |
|---|---:|
| *"Boreing's Convenience"* was originally surveyed for 75 a. | |
| Deficit in measure, | $1\frac{1}{4}$ |
| | $73\frac{3}{4}$ |
| Loses in *"Bold Venture,"* and other elder surveys, | $46\frac{3}{4}$ |
| | $27$ |

| | | |
|---|---:|---:|
| *"Bold Venture"* was originally granted for | 161 | |
| Contains surplus, | $12\frac{1}{4}$ | |
| | | $173\frac{1}{4}$ |
| Loses in elder surveys and water, | | $152\frac{1}{4}$ |
| | | $21$ |
| Vacant land added, | | 5 |
| *"Rogers' Inspection,"* | | 53 |

N. B. About three acres of *"Boreing's Convenience,"* is cleared and cultivated; there is thereon forty-eight young apple trees, and about one hundred and fifty panels of old fence, most of the rails quite rotten. The escheat land is of a middling quality, without any cultivations or improvements; has no rail or clapboard timber on it, and but little other sort of wood. N. RUXTON GAY, *D. S. B. C.*

On the back of the aforegoing certificate was the following endorsements and receipt, viz:

*20th October,* 1759: Examined and passed,

J. Ross, *Exam'r.*

I have received the sum of two pounds two shillings for the within escheat land, one pound twelve shillings for the within vacancy, and one pound ten shillings for the improvements. Patent may therefore issue with his Excellency's approbation.

*28th September,* 1759.     Approved, EDWARD LLOYD.

Patented *28th September,* 1759.   H. SHARPE.

In testimony that the aforegoing is a true copy from the original certificate and plat belonging to and remaining in the *Western Shore* Land Office of *Maryland,*

[SEAL.]     I have hereunto set my hand and affixed my official seal this 17th October, 1842.

GEORGE G. BREWER, *Reg. Ld. Off. W. S. Md.*

Mr. *William Rogers'* pat. 53 as *Rogers' Inspection.*

FREDERICK, &c.   Know ye, that whereas *William Rogers,* of *Baltimore* County, by his humble petition to our agent for management of land affairs within this province, did set forth, that a certain *John Boreing* had, on the 20th April, 1742, surveyed and laid out for him a tract or parcel of land called "*Boreing's Convenience,*" lying and being in the county aforesaid, containing seventy-five acres, by virtue of an assignment for that quantity from *Thomas Sheredine,* being part of a warrant for four hundred acres, granted said *Sheredine* the 24th October, 1741, as per the certificate thereof taken and returned in the Land Office might appear.  The petitioner further shewed that the said certificate had laid over since in the office postponed, and no patent had ever yet issued thereon, and as the two years for sueing out such grant was expired, the petitioner was advised that by sundry of our proclamations published, the certificate aforesaid was become null and void, and the land and premises thereon mentioned subjected to the benefit of the first discoverer; and inasmuch as the petitioner was the first discoverer, and desired to take up and pay for the same, humbly prayed a special warrant to resurvey the aforesaid tract, with the liberty of adding any contiguous vacancy, and return of a certificate of such resurvey, he paying the caution money and complying with all other requisites usual in such

cases, might have our grant issue unto him thereon, which was granted him, and accordingly a warrant on the 27th April, 1759, unto him for that purpose did issue; but the said warrant, not being yet executed, it was, on the 18th June, 1759, renewed and continued in force for six months longer from that date, with liberty therein given to include a certain tract of escheat land called " *Bold Venture*," contiguous to the former tract originally granted unto a certain *John Oulton* for one hundred and sixty-one acres, died seized thereof intestate and without heirs, by which means the same became escheat to us, humbly prayed to be admitted to the purchase of the said escheat, being it escheat by the means aforesaid for any other ways or means whatsoever: In pursuance whereof, it is certified in our Land Office that the aforesaid tracts or parcels of land are surveyed, by which it appears that that tract called " *Boreing's Venture*," clear of elder surveys, contains no more than the quantity of twenty-seven acres; and that parcel of escheat land called " *Bold Venture*," also clear of elder surveys, contains no more than the quantity of twenty-one acres; and that there is the quantity of five acres of vacant land added, for which he has paid and satisfied unto *Edward Lloyd, Esq.*, our present agent and receiver general, as well the sum of one pound twelve shillings for said vacancy, as the sum of two pounds two shillings, being the purchase money agreed upon for the said escheat: In consideration whereof, and other, the premises, we do therefore hereby grant and confirm unto him, the said *William Rogers*, all them the aforesaid two tracts or parcels of land now resurveyed and called "*Rogers' Inspection*," beginning for the first mentioned part in the east line of a tract of land called " *Todd's Range*," and where the said east line of " *Todd's Range*" intersects the west side of " *Jones' Falls*," and running thence bounding on and with the said east line of " *Todd's Range*," east one hundred and ninety-eight perches, until it intersects the south south-west three hundred and twenty perches line of the original escheat tract called " *Bold Venture ;*" then bounding on and with that line south south-west twenty-nine perches, until it intersects the east line of a tract

of land called " *Cole's Harbor ;*" then bounding on and with that line of *Cole's Harbor* east sixty perches, until it intersects the north north-east three hundred and twenty perches line of a tract of land called " *Mountenay's Neck ;*" then bounding on that line to the end thereof north north-east forty-four perches, then west north-west fifty-four perches, unto the end of the west north-west fifty-four perches line of the original escheat tract called "*Bold Venture ;*" then south south-west twenty perches, until it intersects the east one hundred and eighty-one perches line of a tract of land called "*Garron Barrow ;*" then bounding on that line, *reverst* of the same, west one hundred and twenty-two perches, unto the end of the south six degrees, west thirty-seven perches line of said land ; then bounding on that line reverse of the same, north six degrees, east twenty-nine perches and three-quarters of a perch, until it intersects the east line of a tract of land called " *Hanson's Wood Lot ;*" then bounding on that line, reverse of the same, west twenty-one perches and half a perch, until it intersects the south by west line of a tract of land called " *Salisbury Plains ;*" then bounding on and with that line to the end thereof south by west thirty-nine perches ; then bounding and with the given line of " *Salisbury Plains,*" north forty-one degrees and thirty minutes, west ninety-one perches and half a perch, until it intersects the given line of a tract of land called " *Lunn's Lot ;*" and then with a strait line to the place of beginning—containing and laid out for fifty acres and the fourth part of an acre more or less : beginning, for the other part, at a bounded *white oak* standing near the side of the north-west branch of *Patapsco,* it being the second bounded tree of a tract of land called "*Mountenay's Neck,*" and running thence, bounding on the said land east south-east seventy-one perches, unto a creek of the said north-west branch ; then bounding down with the said creek south twenty degrees, west seven perches, unto the mouth of said creek ; then bounding upward on said north-west branch the four following courses, viz: north fifty-eight degrees, west thirty-five perches, south eighty degrees, west sixteen perches, north seventy-four degrees, west ten perches, north

thirty-three degrees, west twenty perches, and then with a straight line to the beginning—containing and now laid out for two acres and three-quarters of an acre, more or less, and containing and laid out in the whole in both the aforesaid parts for fifty-three acres, more or less, according to the certificate of survey thereof, taken and returned into our Land Office, bearing date the 30th June, 1759, and there remaining, together, &c. Given, &c. this 28th September, 1759.

The defendants objected to the admissibility of said warrant to *Edward Fell*, and the certificate thereon, as evidence to prove the death of said *Oulton*, intestate and without heirs, before the year 1745, either alone or in connection as aforesaid with said certificate, warrant and patent of *Rogers' Inspection;* and the Court (ARCHER, C. J. and LE GRAND, A. J.) refused to admit said warrant to *Edward Fell*, and the certificate thereon, to be read in evidence for the purpose aforesaid. The plaintiff excepted.

2D EXCEPTION.—The plaintiffs and defendants having respectively offered the testimony stated in the aforegoing bill of exceptions, and which is made part of this, the plaintiff further offered to read in evidence, for showing (alone, or in connection with the evidence already offered in this case) that *"Bold Venture"* is not correctly located by the defendants, the following record of resurvey in the matter of *"Bold Venture,"* the finding of the jury, under which it is admitted is located by the plaintiffs on the plats as follows, to wit: from M to H, to *Bold Adventure*, one hundred and sixty-one acres.

By virtue of a warrant granted out of *Baltimore* County Court, to *Capt. John Oulton*, to ascertain the ancient metes and bounds of a tract of land called the *"Bold Adventure,"* I, *Richard Colegate, Queens' surveyor of the said county*, have, in the presence of the sheriff of the said county, and by the directions of a jury, whose verdict is hereunto annexed, laid out the said land: beginning at a bounded *white oak*, standing on the north side of a branch called *Jones'*, which *white oak* is judged by the said jury to be the first bounds of the *Bold*

*Venture;* and running thence north north-east fifty-eight per-ches, near a bounded *red oak;* then west north-west one hun-dred perches, into a small run; then north north-east three hundred and twenty perches; then west north-west fifty-four perches; then south south-west three hundred and twenty per-ches, near to a bound ash; then south south-west two de-grees, southerly twenty-four perches, to the river side; then down the river, south south-east two degrees, easterly, eleven perches; then south south-west two degrees, southerly twenty-four perches; then with a direct line to the first bounds, con-taining, and now laid out for one hundred and sixty-one acres, more or less.                    Per RICHARD COLEGATE,
   *May* 10*th,* 1707.    *Queen's Surveyor, Baltimore County.*

The deposition of *John Cole,* aged about thirty-eight years or thereabouts, did declare, that about fourteen years ago, the said *John Oulton* did take up this said land called *Bold Venture,* and did begin at this tree and run to a *red oak,* and from thence to a *white oak;* for he sayeth that he can very well remember it, for he carried the one end of the chain; and further sayeth not.
   *May* 10*th,* 1707.    S. FRA DALLAHIDE, *Sheriff.*

The deposition of *Richard Miller,* aged about forty-one or thereabouts, did declare, that about fourteen years past, the said *John Oulton* did take up this said land called *Bould Ad-venture,* and did begin at this tree and run to a *red oak,* and from thence to a *white oak;* for he sayeth that he can very well remember it, for he carried the one end of the chain; and further sayeth not.
   *May* 10*th,* 1707.    S. FRA DALLAHIDE, *Sheriff.*

May 10th, 1707.  By virtue of a warrant of resurvey, granted out of *Baltimore* County Court, bearing date the 4th March, Anno 1706–7, unto *Capt. John Oulton,* for the same county, for to resurvey a certain tract of land called the *Bold Adventure,* containing one hundred sixty-six acres. Now we of the jury, having heard the oaths of *John Cole* and *Richard Miller,* being sworn upon the Holy Evangelist, do say that the

19    v.6

said land must begin with a bounded *white oak*, standing on the north side of a branch called *Jones' Branch,* being the first tree named in the patent; and from thence north northeast fifty-eight perches to a bounded *red oak*, it being a bounded tree of *Mountenay's* land; and from thence with *Mountenay's* land west north-west one hundred perches, to a bounded *white oak* of *Mountenay's* land; then with the said *Mountenay's* long line north north-east three hundred and twenty perches; then north-west fifty-four perches; then south south-west three hundred and twenty perches to a bounded *ash;* and so according to all the ancient metes and bounds else that belongs to the said land. In witness whereof, we, whose names are under written, have set our hands and fixed our seals the day and year above written.

S. Fra Dallahide, <em>Sheriff.</em>

John Thomas, [Seal, &c.]

Baltimore County, *to wit:* I hereby certify that the foregoing is a true copy from the Land Records of *Baltimore* County, Liber H. W., No. 5.

In testimony whereof, I have hereto subscribed my name [SEAL.] and affixed the seal of *Baltimore* County Court this 17th September, 1846.

A. W. Bradford, <em>Clerk Balt. Co. Court.</em>

And it being further admitted and agreed that said location is to be considered as located by the defendants by the location as relied on by them made by them of *Bold Venture.* And the plaintiffs further offered to prove the truth of their said location; but the defendants objected to the admission in evidence of said record of resurvey, as inadmissible as evidence in this cause for any purpose; and secondly, if admissible at all, as inadmissible for the purpose of altering or controlling the calls of the said patent of *"Bold Venture,"* or varying the true construction of said patent; and the Court (Archer, C. J. and Le Grand, A. J.) was of opinion that the said record of resurvey was inadmissible in evidence and refused to admit the same.

The plaintiffs excepted.

3D Exception.—The plaintiffs and defendants having respectively given the testimony stated in the aforegoing bills of exceptions, and which is made part of this, the plaintiffs, for the purpose of proving that *John Oulton*, the patentee of "*Bold Venture*," was, at the date of the patent for "*Rogers' Inspection*," dead, without heirs and intestate, offered in evidence said patent for "*Rogers' Inspection*," set forth in the first bill of exceptions: and thereupon, the plaintiffs prayed the Court to direct the jury as follows:—

1st. If the jury shall find from the evidence, that a patent was granted by the State of *Maryland* to *Alexander Mountenay*, on the 30th June, 1663, the escheat patent granted to *William Fell*, on the 12th July, 1737, and that *Edward Fell*, was heir-at-law to said *William*, and the deed from *Edward Fell* to *Thomas Sligh*, dated the 17th August, 1758, and that said *Fell* was the owner of *Island Point* and *Fell's Prospect;* and if the jury also find the deed of the 25th July, 1760, from said *Thomas Sligh* to *Charles Weisenthal;* the deed from said *Weisenthal* to *John Cornthwaite*, of the 7th December, 1775; the deed from *John Cornthwaite* to *David Brown*, of the 8th July, 1782; and the deed from *William Matthews*, attorney in fact of *John Brown*, to *David Brown* of the 13th December, 1793; and also the agreement between the attorneys for the plaintiffs and defendants in this cause; and the ordinance of the City of *Baltimore*, given in evidence of the year 1823; and shall also find from the evidence, that under said ordinance the ground was filled up by the city authorities, and that the land in dispute in this cause was made fast land, and raised above high-water mark, and was fenced in by the defendants before the impetration of the writ in this cause; and if the jury shall find that the beginning of *Bold Venture* is not truly located on the plats by the defendants, or if truly located, they shall find that the title to said tract became vested in the State by escheat in 1759, then the plaintiffs are entitled to recover.

2d. That before the plaintiffs in this cause can be barred from their recovery by reason of the patent of *Bold Venture*, the defendants must shew title in the State, or such outstanding

title in some third person to said tract, as would enable him to recover in ejectment against both the contending parties in this case.

3d.   That the jury must find that the tract of *Bold Venture* has been truly located by the defendants, and that they cannot so find, unless they find that the beginning of said tract is properly located, and in order to that conclusion, must find that the same is located on the north side of *Patapsco* river.

4th.   That the beginning cannot be found for "*Bold Venture*" by reversal of the line from the first established boundary, unless the jury be satisfied that the beginning tree could have stood at the point to which the reversal would carry the line, to wit, at the point red A on the plat; and that if the jury believe that at and about the point A, at the period of the survey for the patent of "*Bold Venture*," the water of the *Patapsco* river flowed, and the water line of said river was as laid down for the several periods on the plat, then the jury cannot find that the tree could have stood at said point A.

5th.   That the defendants have offered no sufficient evidence of the location of "*Bold Venture ;*" because they have offered no testimony of any endeavor being made to find the beginning of the tract, and because they have not located *Whetstone Branch,* that being the place on which said beginning is described in the patent to be, and where said beginning tree should have been sought for.

6th.   That the defendants have not truly located "*Bold Venture,*" if the jury shall find from the testimony that the line from M to A should have been run with allowance for variation, and has not been run so, and that they must so find if they believe the testimony of *Mr. Bouldin.*

7th.   That the defendants have not truly located "*Bold Venture,*" inasmuch as they cannot run the fifth line of that tract, as they have located it on the plats, further than to the river side, as designated on the plat by a black broken line, shaded blue, a little distant from Z, and south-westerly thereof.

8th.   If the jury find from the evidence that the first bound or beginning tree of *Mountenay's Neck* was a *red oak,* and

stood at the spot marked on the plats as black M; and if the jury believe that said tree was a bound tree of "*Long Island Point*," and the only *red oak* which was among the bound trees of said tract; and if the jury find from the evidence in this cause, that said *red oak* was destroyed, and a *white oak* standing at the same spot was then made the beginning bound tree of *Mountenay's Neck*, and a bound tree of "*Long Island Point*," as a substitute for said *red oak*; and if the jury believe that said *white oak* was the tree referred to in the patent of *Bold Venture* as a bound tree of "*Poultney's Point*;" and if the jury believe from the evidence that "*Poultney's Point*" and *Long Island Point*" are the same tract under different names, then they are bound to find the beginning tree of "*Bold Venture*" at M.

9th. That the jury must find that the *red oak* called for at the termination of the seventh line of *Long Island Point*, in the patent of that tract, (as a bounded *red oak* of a parcel of land laid out for *Alexander Mountenay*,) stood as it is located on the plats at M.

10th. That if the jury believed a *white oak* was substituted in the place of the *red oak* mentioned in the preceding prayer, as a boundary of *Long Island Point*, and that it was so substituted at, or before the year 1695, and that said last mentioned *oak* was a bounded tree of *Bold Venture*, then they must find that it was the beginning tree of said tract.

11th. If the jury believe from the evidence that *Oulton* was under a mistake as to the true location of the patent of *Mountenay's Neck*, and supposed that its beginning tree was at H, and accordingly called for his first line to terminate at a *red oak* at that spot, then said call of itself does not establish that at that time a *red oak* stood as the first boundary of *Mountenay's Neck*, according to its true location.

12th. *That there is evidence from the recitals of the patents offered in this cause*, and from the undisputed locations on the plats, and *the verdict of the jury and certificate of the surveyor*, and the depositions accompanying the same, from which the jury may find that the *red oak*, the original beginning tree of

*Mountenay's Neck,* was destroyed in 1695, and that a *white oak* at, or before that time, was substituted in its place.

13th.  That whether the beginning tree of *Bold Venture* originally stood at M, is a question of fact to be ascertained by the jury, and not a question of law, to be authoritatively decided by the court.

14th.  That there is evidence in this cause from which the jury may find that the true beginning of *Bold Venture,* as originally located by *John Oulton,* was at black M, as marked on the plats.

15th.  That if the jury find the location of the tract of *Bold Venture,* as made by the defendants, particularly the beginning at A, even with such degrees of allowance for variation of the compass as they may think it right to allow, is not true, but false, then they cannot give their verdict for the defendants in support of such false locations.

16th.  If the jury find from the evidence that the location of *Bold Venture* by the defendants is correct, and from the warrant, certificate and patent thereof, that no intimation or statement was given to the Lord Proprietary, that so much of the said tract as they may find, was covered by navigable water, was in fact so covered, and if the jury find that the said *John Oulton* purposely kept back and fraudulently concealed the fact that so much of the said tract was covered by navigable water, and that it was in front of the elder tract binding on or in the water, granted to *Alexander Mountenay,* then the patent to said *Oulton* was void, at least so far as it extended into navigable water.

17th.  That it was not competent to the Lord Proprietary to grant to *John Oulton* the soil covered by navigable water, in front of and with the water line of *Mountenay's Neck,* that such grant was in derogation of the patent to *Mountenay,* and void.

18th.  That the fifth line of *Bold Venture* should, as defendants have located it, be shortened above, or at the river side near **Z,** so as to gratify the call of the sixth line of that tract, which is to terminate at the river side, and that so much of the

sixth line as is necessary for the same purpose should be stricken out.

And the defendants prayed the court to direct the jury as follows:

1st. That the location of *Mountenay's Neck* on the plats in the case, not having been counter-located, the jury must find such location of that tract to be the correct one.

2d. If the jury find that the tract of land called *Bold Venture* was granted as given in evidence by the defendants, and that the defendants' location of the *second* and *third* lines of that tract on the plats in the case is the correct location, that then the patent of *Mountenay's Neck* gives no title to the lessors of the plaintiffs to the lot of ground for which the defendants have taken issue on the plats.

3d. That the *second* and *third* lines of the said tract, called *Bold Venture*, if the jury find said tract was granted as given in evidence by the defendants, must run with two lines of the tract of land called *Mountenay's Neck*, as that latter tract is located on the plats, and if the jury find that the said two lines are those on the plats running from black M to black N, and from black N to red figures 320, that then the patent of the tract, *Mountenay's Neck*, gives no title to the lessors of the plaintiffs, to the lot of ground for which the defendants have taken defence on the plats in the case.

But the court, (ARCHER, C. J., LE GRAND, A. J.) granted only the *second* and *ninth* of the plaintiffs' prayers, and rejected the others, and in respect of the prayers of the defendants, gave the same to the jury. To which rejection and direction by the court, the plaintiffs excepted.

The plaintiffs below prosecuted this appeal.

The cause was argued before DORSEY, CHAMBERS, SPENCE, and MAGRUDER, J.

By MAYER and DULANY for the appellants, and

By W. F. GILES, McMAHON and REVERDY JOHNSON for the appellees.

DORSEY, J., delivered the opinion of this court.

The point in this cause, most strenuously urged and relied on by the plaintiffs, is, that the beginning of the tract of land called *Bold Venture,* cannot be found by reversing the course and distance of its first line from the boundary called for at its termination, as expressed in the patent; because, by such reversal of the line, the beginning thereof is shown to be in deep navigable water, a great distance from the shore, and where the beginning tree called for, as at the commencement of the first line, could not possibly have stood at the date of the grant. As the decision of this question, if in favor of the plaintiffs, would be decisive of the present controversy under a decision of this court upon the appeal from the *first trial* of the case in the County Court, it appropriately, from its importance, is first entitled to our consideration. And to aid in its determination it may not be amiss to lay down some propositions, and make some suggestions in elucidation of the question before us.

If a tract of land call to begin at a bounded tree by the side of the branch, and to run thence course and distance to a known boundary, and the beginning tree be lost, to find the commencement of the first line of the tract you must reverse the course and distance from the known boundary, called for at the end of the first line, and not elongate, nor shorten, the line to the branch; the expression as to the branch being merely descriptive of the general locality of the tree, not an imperative call locating the spot where the tree stood. The words "by the side of a branch," thus used, are no indentification of a particular spot where the tree must have stood. The commencement of the line at any one of ten thousand different spots by the branch side, at great distances from each other, would comply with such a description of the beginning. Instead then of obtaining what is the leading object in the gratification of all calls, certainty in the location of grants of land, by adopting the principle contended for, that the line must be made to terminate at the branch, you establish a rule productive of the greatest uncertainty. If the words " standing by the side of a branch," be regarded as an imperative call fixing the termination of the

line where the boundary is lost, both course and distance may be disregarded to reach it; it controls them both. Suppose neither course nor distance will strike the side of the branch; by whom is the particular spot on the branch side for the termination of the line to be determined? by the court or by the jury? And by what principles of law or fact is the determination to be governed? Suppose there be a point on the branch side which might be reached by the distance, but is wholly inconsistent with the course, in accordance with which the extension of the line to the branch side would expend ten times the number of perches, and include ten times the quantity of land expressed in the patent: which would you gratify, the course, or the distance? The general rule is, that if there be a peremptory call to an object of length by a course and distance line, and the object can be reached by gratifying the distance, but violating the course, or by conforming to the course and disregarding the distance, the course must control the distance; the termination of the line being thereby fixed with greater certainty. As the termination of the line is at the point where the course first strikes the object called for; whereas, there might be various points in the object called for, equidistant from the beginning of the line to be run.

The word "by," when descriptively used in a grant as in the case before us, does not mean "in immediate contact with," but "near" to the object to which it relates. And "near," is a relative term, meaning, when used in land patents, very unequal and different distances.

Suppose the boundary sought to be established, instead of being expressed as standing at the beginning of the first line of the tract of land sought to be located, was described as a boundary standing at the end of the first line, and consequently the beginning of the second line of the survey; and the boundary not being known, by running course and distance the line would terminate in navigable water, as deep, and quite as far from the shore, as the first line of *Bold Venture* reversed, does in the case before us. Would the patentee lose all benefit from his grant by such an occurrence? or would not the

court, in accordance with the dictates of justice, *ut res magis valeat quam pereat*, rather say, we will disregard what is said of the bounded tree as a means of showing the terminus of the first line, and will ascertain it by the course and distance, which by the patent, the line is expressed to run. The reason assigned for running the lines of lands to the boundaries called for at their terminations, instead of terminating them according to their courses and distances, is not exclusively that greater certainty as to the termini of such lines is thereby attained, but also because thus locating their grants is more beneficial to the grantees, and because it is rule of construction in expounding grants, to give them that interpretation which operates most strongly against the grantors, and in favor of the grantees. There is not the shadow of a reason for giving validity and operation to a patent whose second or subsequent boundary being unknown, the expressed course and distance thereto shall terminate in like circumstances to the alleged beginning of *Bold Venture*, that would not apply with equal force to a similar termination of the first line of a tract of land, reversed, to find its first beginning.

A deed or patent for a tract of land passes nothing unless the land described therein is susceptible of location, or in other words, unless the survey thereof can be made to close. And it is perfectly immaterial whether the impediment to location arise from an inability to ascertain the beginning of the first line of the land granted, or the end thereof; or the beginning or end of any other of its lines. In either case, no title to the land is transferred under the deed or patent, unless it be in the rare case of the lines of a tract of land crossing each other, or coming in contact, so as entirely to enclose a separate part of the tract, before the occurrence of the insurmountable obstacle to the enclosure of the entirety.

If a tract of land be granted by boundaries only, without courses and distances, as beginning at A, and running thence a straight line to B, thence to C, thence to D, and so on to the beginning. If the beginning or any subsequent boundary be lost, and its original situs be insusceptible of establishment by proof,

the entire tract of land is lost, and the grant thereby becomes inoperative and void.  So, if a tract of land be granted by courses and distances only, without calling for any boundary or object save that described as standing at the commencement of its first line, and that boundary or object be lost and no legitimate proof can be adduced of the beginning or ending of any of its lines, the tract of land, thenceforth, becomes a nonentity : the grant for its conveyance, a nullity.  But if a grant be made not only with courses and distances, but with calls for objects or boundaries at the ends of some of its lines, it has a principle of self-sustentation imparted to it, not possessed by either of the two first mentioned grants.  And, therefore, if the beginning, and any, or all the boundaries, save one, are lost and incapable of being proved, the vitality of the grant still continues, its legal validity is as fully recognized, as if all its boundaries were still known and in being.  And this principle of self-preservation does not owe its existence to any implied construction of the grants resulting from the dictates of justice, public policy, or expediency, but is the natural import of the express words of the grant, which declares not only that the lines are to be run to the specified calls, but that each line is to be run a specified course and distance.  *Prima facie* then the terms and expressions of the grant are as fully complied with, by running the tract of land by course and distance, as if it were run in conformity to the calls.  In the contemplation of the grant, both modes of running were to lead to the same points; the same results.  Where a line of a tract calls for a boundary at its beginning, and a boundary at its end, and one of the boundaries be lost, the beginning or end of the line where it is alleged to have stood, is found with equal facility.  And the same mathematical certainty is obtained whether you run the course and distance progressively to the end of the line, or retrogressively—that is reversely—to its beginning.  With equal truth and precision, the desired object is accomplished in both modes of proceeding.

But suppose it were conceded that the words " by the side of the branch" create an imperative call, and that the reversed

line must be elongated to reach it, or shortened to stop at it, what benefit would such a construction ultimately confer on the plaintiffs? Unquestionably none. Because then the reversed first line of *Bold Venture*, instead of terminating at red A, would be elongated to *Long Island Point*, at the water line of the north-west branch; and as effectually accomplish the objects of the defendants, as it would do in terminating at the red letter A.

It cannot be denied that a valid survey or grant of a tract of land may be made, without stating any natural object as being at the beginning of its first line, if there be boundary at the termination thereof, for example, the beginning of *Bold Venture*, as described in the patent of *Rogers' Inspection.* Such, indeed, is the true import and condition of the grant of *Bold Venture*, rejecting the statement as to the bounded tree, alleged to stand at its beginning. And it is equally clear, that it forms no objection to the validity of a grant of land, that the place of its beginning is covered with water, whether navigable or otherwise, or that any of its lines run across such water. It is also undeniably established by authority, that if the beginning tree of a tract of land be lost, and the lines thereof have courses and distances, and one of them also a known boundary, that the beginning of the tract may be found by reversing the courses, and expending the number of perches on the anterior lines. But it is alleged by the appellants' counsel, that the beginning of a tract cannot be thus established, where it appears that the lost beginning could not have stood, at the time of the survey, at the point, thus ascertained by the reversed course and distance running. If there be such an exception to the general rule so well established, as to the mode of finding the beginning of tracts of land, whose beginning trees have been lost, it is incumbent upon him to produce the authority by which the exception is sustained. This he has wholly failed to do. And he is equally in default in not having shown, that upon reason, or the analogies of the law, such an exception ought to prevail.

Why is it that a plaintiff in ejectment in any case is unable to recover, by reason of his inability to prove his beginning tree?

It is because, not having proved the beginning of his tract, he has lost all means of making or sustaining his location thereof, and consequently fails in his action. In reference to any other question, the inquiry rarely, if ever, would have been entered into, as to the truth or falsehood, possibility or impossibility, of the statements in the grant relating to the trees, alleged to be standing at the commencement of the first line of the tract. Conceding the whole statement, as to the beginning trees of *Bold Venture* to be false and impossible, what would it avail the plaintiffs below? Nothing. The grant of the land is uncontroverted. By its course and distance lines, and remaining boundary, a location thereof can be established. Land so granted, when the boundaries are all known, is capable of two modes of location. The one by running the lines to the boundaries called for, without regard to the courses and distances; the other is to run the land according to its courses and distances, without reference to its boundaries. Both these modes of running are in perfect consistency with every thing appearing upon the face of the grant. But lest there should be a diversity in the results, thus obtained by different means, and, in order, as is supposed, to give greater certainty to the locations of grants of land, and to give them that operation which shall be most beneficial to grantees, the courts of this State have determined that in all locations of lands the first mentioned mode of running shall, if practicable, be conformed to ; but if that be impracticable by reason of an inability, from any cause to prove the boundaries, the land shall be located by running its lines according to their courses and distances. It is no unusual thing for old surveys of land in this State, where boundaries are called for at the end of its lines, to contain an excess in quantity, sometimes twice, three times, or four times, as much land when run by its boundaries, as when located according to its courses and distances. The quantity, in such cases expressed in the patents, being always the same, with that ascertained by a course and distance running. That such discrepancies were the result of mistakes, nobody can believe ; nay, it is a matter of history, and of notoriety, that they were

matters of design, and our courts might well say that running lands, (granted by the Lord Proprietary) according to their boundaries and calls, was more beneficial to the grantees than a course and distance running. It would thence follow, as clear as mathematical demonstration can show any thing, that the lines of such surveys, when run course and distance, could not terminate at the points, where stood the boundaries called for as the termini of those lines. And hence, it is apparent, that if a boundary or beginning of such a survey were lost, no course and distance running, whether progressive, or retrogressive, could possibly conduct you to the point, where the lost boundary or beginning originally stood. According then to the doctrine contended for by the appellants as to *Bold Venture*, if in any of the surveys mentioned, a beginning or boundary thereof be lost, the whole tract of land is utterly lost, being incapable of true location, by any running of the course and distance lines, reversely, or progressively. To such a discovery the case before us certainly has given birth. Of it the venerated founders and expounders of the land law of *Maryland*, never appear to have caught a glimpse; or so many thousands, tens of thousands, or perhaps hundreds of thousands of acres of land, would not have been held for perhaps a century in opposition to such a principle by citizens of this State, who never dreamed of a taint or defect in their titles. In finding the beginning where, as is alleged, stood a bounded tree of a tract of land, or the terminus of one of its lines, which calls for a boundary that may have been lost, properly speaking, you do not resort to a course and distance running, either direct, or reverse, for the purpose of finding the spot where the lost tree or boundary in point of fact stood; but to find the beginning or end of the line, as the case may be, where it is stated to have stood. And such running, in contemplation of law, establishes the beginning of the tract or termination of its lines, whether in truth or in fact the beginning tree or bounded tree did stand or could have stood there or not : and this legal conclusion is wholly unaffected by the belief or disbelief of the court or jury upon that subject.

If proof were required to show that course and distance lines are elongated when run from boundary to boundary, it is furnished by the first line of *Mountenay's Neck,* which, by the patent, is expressed to run one hundred perches, but measures one hundred and thirty-three perches, when run from the boundary at M to that at N.

A great variety of other points have been mooted in the argument of this cause, on which it is not deemed necessary to express any opinion, as many of them are settled by this court, in the case of *Casey's lessee vs. Inloes et al.,* reported in 1 *Gill,* 430; and they are not presented for our adjudication by the record before us. It is deemed expedient, therefore, to proceed to the examination of the exceptions separately, and of each of the parties' prayers, as stated in the last bill of exceptions.

In rejecting, (as appears by the *first* bill of exceptions,) the escheat warrant and certificate of *Edward Fell* for *Bold Venture,* when offered as proof that *John Oulton* died intestate, and without heirs, before the year 1745, the County Court committed no error. In *Casey's lessee vs. Inloes et al.,* this court decided, that an escheat grant is *prima facie* evidence that the land granted is liable to escheat at the date of issuing the escheat warrant, and not antecedently; "the court regarding the statement of that fact in the warrant, upon the representation of the grantee, as being so avouched and verified by his payment of the purchase money, and acceptance of the patent, as to entitle it to the character of *prima facie* evidence. But in the case before us, the statement in the warrant was sustained by no such avouchment and verification; on the contrary, the County Court very properly regarded the statement as discredited, if not falsified, by the omission or refusal of the person to whom the warrant issued to consummate his title, and pay the required portion of the value of the land escheated, as evidence of his having discovered that there devolved upon the Lord Proprietary no title by escheat,—and, therefore, rejected the proffered testimony for the purpose for which it was offered.

In rejecting the testimony offered by the plaintiffs in the second bill of exceptions, there is no error; there being at the date of the proceedings offered in evidence, no law authorizing or directing the same, or the recording thereof—the court below could not do otherwise than reject a paper, purporting to be a copy of the record, which, in the eye of the law, was no record at all. The court also rightly rejected the testimony, because it sought to establish the true location of *Bold Venture*, by running it in a way wholly inconsistent with the calls and expressions contained in its patent.

Of the County Court's refusal to grant the first prayer of the plaintiffs, they have no reason to complain. It called for an instruction to the jury, that if they "shall find that the beginning of *Bold Venture* is not truly located on the plats by the defendants; or, if truly located, they shall find that the title to said tract became vested in the State, by escheat, in 1759, then the plaintiffs are entitled to recover." To the first branch of the prayer, the plaintiffs were not entitled; because M, the beginning of *Mountenay's Neck*, being admitted by the locations of both parties—and the patent of *Bold Venture* having declared it to be the end of its first line, the jury were precluded from any finding to the contrary. And the bounded tree called for at the beginning of the first line of *Bold Venture* being lost, it is matter of law, to be pronounced by the court—not a matter of fact, to be found by the jury, that the beginning of the tract of land was to be found by expending the number of perches expressed in the patent, as the length of the first line on the reversed course and distance thereof. In conformity to this principle of law, the beginning of *Bold Venture* had been ascertained and located· on the plats by the surveyor; and there was not the shadow of proof, or of suspicion, that such ascertainment had not been correctly made: under such circumstances, to have permitted the jury to pass upon the correctness of such a location of *Bold Venture* would, in effect, have submitted to the finding of the jury the soundness of the principle of law, under which the location had been

made;—or, in other words, it would have authorized the jury to determine a matter of law, not of fact.

In refusing the first alternative of the plaintiffs' prayer, no error is perceived; and the principles settled by this court, in *Casey vs. Inloes*, 1 *Gill*, 430, show that the County Court were clearly right, in refusing the prayer upon its second alternative.

By the act of 1745, ch. 9, the State granted no right which accrued to it, subsequently to the passage of that act of Assembly. An escheat grant, by the State, is no evidence of the existence of the facts constituting the escheat, anterior to the date of the warrant. Of course, if these principles are adhered to, the court below could not do otherwise than refuse to instruct the jury, that an escheat title accruing to the State in 1759, would entitle the plaintiffs to recover under the operation of the act of 1745.

The second and ninth prayers of the plaintiffs having been granted by the court below, they form no subject for revision under the present appeal.

The *third* prayer of the plaintiffs was rightfully rejected by the County Court, for a reason heretofore assigned in support of its rejection of their first prayer. The granting of it would, in fact, have conferred on the jury a discretionary power of finding the principle of law by which the beginning of *Bold Venture* was established, which principle it was the province of the court to declare—not of the jury to find as a matter of fact. And by granting the prayer, the jury might well have understood it to be (as in effect it would have been) an instruction to them, that there could be no true location of *Bold Venture* which did not locate its beginning entirely on the north side, of the northern water line, of the *Patapsco* river—thus giving to expressions in a grant, intended merely as generally descriptive of locality, a conclusive and restrictive import, which is clearly denied to them by the unquestioned decisions of the highest judicial tribunals of *Maryland*. In proof whereof, it is deemed sufficient to refer to the case of *Hammond vs. Ridgely*, 5 *Har. & Johns.* 245.

21　　v.6.

That the County Court, in refusing the plaintiffs' *fourth* prayer, were right, is sufficiently shown by the positions asserted in the previous part of this opinion.

The court below did not err in refusing to instruct the jury, as required by the *fifth* prayer of the plaintiffs, that the defendants had offered no sufficient evidence of the location of *Bold Venture;* " because they have offered no testimony of any endeavor being made to find the beginning of the tract; and because they have not located *Whetstone Branch*—that being the place on which said beginning is described in the patent to be, and where said beginning tree is sought for." The first reason is insufficient, because the testimony, given by the defendants through the surveyor, in the absence of all impugning proof, relieves them from the obligation supposed to rest upon them; and had no such evidence been given by the surveyor, the plaintiffs, themselves, had offered all the requisite testimony upon the subject, by their location of the escheat grant of *Bold Venture,* called *Rogers' Inspection,* which shows that in 1759, the beginning tree of *Bold Venture* was lost, and could not be found; and that, at that time, the beginning of the tract was ascertained in the same manner, and was located at the same place, that the defendants have done on the plats before us. The second reason is also insufficient, because it was understood as being admitted by the parties in the cause, that *Whetstone Branch* was located. But suppose no such admission was made, or intended to be made, it interposes no objection to the defendants' location of *Bold Venture.* The tree being lost for reasons hereinbefore stated, the spot where it stood is not so indentified by the description in the patent, as to enable the surveyor to locate it with any reasonable degree of certainty. It must, therefore, be rejected, as forming a less certain mode of finding the beginning of the tract of land, than by reversing course and distance from the first known boundary.

The sixth prayer of the plaintiffs is " that the defendants have not truly located *Bold Venture,* if the jury shall find from the testimony, that the line from M to A should have been run with allowance for variation, and has *not* been run so, and

that they must so find if they believe the testimony of *Mr. Bouldin.*"

It cannot be denied, but that the jury are the proper tribunal to decide whether any, and what, variation ought to be allowed in the location of lands. But whether any, and what, degree of allowance for variation, ought to be made, are questions of fact, to be determined by the jury on the testimony upon that subject, adduced to them in the trial of the cause. If no such testimony be offered, the jury are not authorized to depart from the courses and distances expressed in the conveyances, by making any allowance for variation. In the case under consideration there was a total absence of all testimony in relation to variation, and consequently, the court could not have done otherwise than refuse the sixth prayer of the plaintiffs. But suppose it had been otherwise, and that there had been evidence before the jury which would have warranted them in making an allowance for variation, and that for the court's error in this respect its judgment were reversed, this court would not send it back to the County Court, to be tried anew, because by no allowance for variation, which the jury could rationally have made, could the merits of the present controversy be in any wise affected.

From the views already expressed, it is apparent that the County Court were right in denying to the plaintiffs the instruction prayed for in their seventh prayer: which was "that the defendants have not truly located *Bold Venture*, inasmuch as they cannot run the fifth line of that tract, as they have located it on the plats further than to the river side, as designated on the plats by a black broken line, shaded blue, a little distant from Z, and south-westerly thereof." The ground upon which only this instruction could have been claimed, must be that the fifth line of *Bold Venture* calls for a bounded oak as its terminus, which could not have stood in the navigable water where the fifth line is made to terminate, according to the defendants course and distance running thereof. Assuming the truth of the facts, on which the plaintiffs base their prayer, it is evident that upon the views hereinbefore expressed upon the

plaintiffs' first prayer, that the instruction prayed for by the seventh prayer could not have been granted. But the same result is equally manifest upon another ground. The fifth line of *Bold Venture* simply calls for a bounded *ash*, without any reference or call to the river side or water. And there is no location or evidence in the cause to prove that where the said fifth line terminates, as run course and distance by the defendants, is not, and always has been, high and fast land, on the north side of the north-west branch of the *Patapsco* river; or, in other words, of " *Whetstone Branch*," where the bounded ash may well be presumed to have stood.

The County Court's refusal to grant the plaintiffs' eighth prayer is equally sustainable. There is no controversy as to the true location of the tract of land called *Mountenay's Neck.* It is a fact admitted by the pleadings in the cause, and which both parties are estopped from denying, that the beginning tree of *Mountenay's Neck*, is truly located at the letter **M**; and that the bounded tree called for as standing at the end of the first line of that tract, is truly located at the letter **N.** The patent of *Bold Venture*, in terms as explicit and positive as language can make them, calls for the bounded red oak, (which is the beginning tree of *Mountenay's Neck*,) as the terminus of its first line, and to run thence, bounding on *Mountenay's* land, the same course and distance as its first, to the bounded white oak (which stands at the end of its first line) of *Mountenay's* land. These two bounded trees are the only boundaries called for in the patent of *Mountenay's Neck.* Looking, then, to the unquestioned boundaries and locations of the first line of *Mountenay's Neck*, and the clear and imperative call for the termination of the first line of *Bold Venture*, it appears most difficult to conceive how a question or doubt could arise as to the place where the first line of *Bold Venture* must terminate. But the patent of *Bold Venture* states its beginning to be at a bounded white oak, standing by the branch side, it being a bounding tree of *Poultney's Point:* and the plaintiffs insist that *Poultney's Point* and *Long Island Point* were one and the same tract of land; and that the only bounded

oak called for by *Long Island Point*, was the oak located at M, the beginning of *Mountenay's Neck*. And they pray the court to instruct the jury, that if they believe these facts, and that the said last mentioned oak was the tree referred to in the patent of *Bold Venture*, as a bounding tree of *Poultney's Point*—then they are bound to find the beginning tree at M. Now, let us concede the truth of all the facts, which the jury are required to believe as the basis of the finding, claimed at their hands by the plaintiffs. What do these facts, when taken in connection with the admission as to the location of the first line and boundaries of *Mountenay's Neck*, and the positive, unequivocal expressions of the patent of *Bold Venture* prove; what the irresistible inference; what the conclusive demonstration? It is that there is an error in the patent of *Bold Venture;* either in the description of the tree alleged to stand at the beginning of the first line of that tract of land, or in the boundary stated to stand at the end of that line. These descriptions are utterly irreconcilable: they cannot both be gratified or stand together; the one or the other must be rejected. It is impossible that both the beginning and end of the first line of *Bold Venture* should be at the same point, at the letter M. Under such circumstances, the court is invoked to declare that M is the beginning of *Bold Venture;* that the peremptory call of the first line of *Bold Venture* to terminate at the boundary at M, is to be, in effect, expunged from the patent. To justify the gratification of such an invocation to the court, not the semblance of an authority has been adduced. There is not a shade of difference between the weight to be ascribed to a call for a boundary, or matter of description thereof, when referred to as the beginning of a tract of land, or as the terminus of one of its lines. Under like circumstances, the obligation to gratify the same is equally imperative in both cases; there is, in this respect, no priority or preference between them. As the ground then, upon which, in the decision of the question raised by this prayer, the opinion of the court below must have been governed, let us enquire what are the probabilities of mistake as to the boundary called

for, or described as standing at the beginning or the end of the first line of *Bold Venture?* What consequences would result from the rejection of the one or the other?

It is most obvious, from an inspection of the patents of *Bold Venture* and *Mountenay's Neck,* that the first line of the former of those tracts calls for the beginning tree of the latter as its terminus; and that the second line of *Bold Venture* was to run with and bind on the first line of *Mountenay's Neck* to its boundary at N; and that the third line of the former tract was to run with and bind on the second line of the latter tract to its termination. And it is a necessary presumption that, in making the survey of *Bold Venture,* on which its patent is founded, those boundaries and lines of *Mountenay's Neck* were known to the surveyor. In his calls for them, therefore, there could have been no mistake; they could have been no other lines and boundaries than they are represented to be in the patent of *Bold Venture*—none others could have been referred to by the surveyor.

But what is the evidence that the surveyor, in describing the beginning tree of *Bold Venture,* referred to, or meant to refer to, the beginning tree of *Mountenay's Neck?* When looking only to the patent of *Bold Venture,* no such reference could possibly be inferred. He describes the tract of land, called *Bold Venture,* as beginning at a bounded white oak, standing by the branch side—it being a bounded tree of *Poultney's Point.* If he had known it to have been a boundary of *Mountenay's Neck,* in all human probability, he would have added to the words *Poultney's Point,* the words "and of *Mountenay's Neck,* or of *Mountenay's Land.*" This omission to do so, is strong evidence that he had no design, belief or knowledge, that he was describing the beginning tree of *Mountenay's Neck* as the beginning tree of *Bold Venture.* The only evidence that he did so, is a call for the beginning of *Mountenay's Neck,* in the fifth line, of *Long Island Point*—the patent or certificate of which, for aught that appears, may never have been seen by the surveyor who executed the warrant under which *Bold Venture* was granted. But let it be con-

ceded that the patent of *Bold Venture* does describe, as its beginning tree, the beginning tree of *Mountenay's Neck*, is it not obvious that such description is founded in mistake or falsehood; and is, therefore, insufficient to overrule and control other calls and expressions in the patent of *Bold Venture*, inconsistent therewith? Assume but the single fact of falsehood or mistake in the description of the beginning tree of *Bold Venture*, as being "a bound tree of *Poultney's Point*," and every other word and expression in the patent may be harmoniously gratified, in perfect consistency with such an assumption. But assume the fact to be as contended for by the plaintiffs, that the beginning of *Bold Venture* is at the letter M, the beginning tree of *Mountenay's Neck*, and see the consequences which would flow from it. You virtually expunge from the patent that clause in it, which directs that the first line of *Bold Venture* shall be run north, north-east fifty-eight perches, and terminate at the beginning tree of *Mountenay's Neck;* and that clause, which calls to run the second line of *Bold Venture* with the first line of *Mountenay's Neck*, to the bounded tree at the letter N; and also that clause, which directs the third line of *Bold Venture* to run with and bind on the second line of *Mountenay's Neck*, three hundred and twenty perches to the end thereof. And although it is apparent from the reading of the patent of *Bold Venture*, that it was intended to bind on and lie wholly clear of *Mountenay's Neck*, you cause a large portion of the former to lie foul of the latter. Under such circumstances, it cannot be a matter of doubt that the court below were right—not only in refusing the plaintiffs' eighth prayer, but would have been justified in giving an instruction to the jury that, according to the true construction of the patent of *Bold Venture*, its beginning could not be at the letter M.

That the tenth and eleventh prayers of the plaintiffs were properly rejected by the County Court, follows from what has been said in relation to their eighth prayer.

The court below were warranted in refusing to grant the plaintiffs' twelfth prayer; because, after the refusal of the court

to grant the eighth prayer, for the reasons hereinbefore stated, there was no matter of fact in issue before the jury, to which the instruction sought could apply, or was material.

And were also warranted in refusing the plaintiffs' thirteenth prayer; because, upon the pleadings and admissions on the plats in the cause, whether the beginning tree of *Bold Venture* originally stood at the letter M, was not a question of fact, but a matter of law, dependent upon the true construction of the patent thereof—as is hereinbefore asserted when examining the eighth: and, it is evident, that it was so regarded by the counsel of the plaintiffs, when he presented the eighth prayer for the court's determination.

The refusal of the County Court to grant the plaintiffs' fourteenth prayer has necessarily been sustained, by what has been said in relation to the eighth and thirteenth prayers.

. There is no error in the County Court's refusal to grant the plaintiffs' fifteenth prayer. Whether any, and what allowance for the variation of the magnetic needle, ought to be made when locating ancient surveys with course and distance lines, is undeniably a question of fact, to be determined by the jury, when testimony, legally sufficient to enable them to form an opinion thereon, has been adduced before them. And like all other matters of fact, the finding of the jury must be founded upon the proof in the cause. If there be no proof upon the subject, the jury are bound to find the locations, according to the courses and distances expressed in the grant, and can make no allowance for variation. It would be productive of great injustice and ruinous consequences to land-holders, if juries were authorized to make whatever allowance for variation their crude notions upon the subject might suggest—unaided and uncontrolled by experience, or the lights of science. In the case before us, no testimony whatever had been offered to the jury in relation to it;—and, consequently, a rejection was the inevitable fate of the fifteenth prayer of the plaintiffs.

The court below correctly refused to grant the plaintiffs' sixteenth prayer, viz: " That if the jury find from the evidence, that the location of *Bold Venture* by the defendants is

correct, and from the warrant, certificate and patent thereof, that no intimation or statement was given to the Lord Proprietary that so much of the said tract, as they may find was covered by navigable water, was in fact so covered; and if the jury find that the said *John Oulton* purposely kept back, and fraudulently concealed the fact that so much of the said tract was covered by navigable water, and that it was in front of the elder tract, binding on or in the water, granted to *Alexander Mountenay*—then the patent to said *Oulton* was void, at least so far as it extended into navigable water. On whom the alleged fraud was perpetrated, or designed to be perpetrated, the prayer does not assert, but leaves that question as a subject of amusing speculation and investigation for the court. From the first part of the prayers making it an indispensable ingredient to the fraud—the failure to communicate to the Lord Proprietary the condition of the land granted, as regards navigable water—it might be inferred that the alleged fraud was supposed to have been committed upon the rights and interests of the Lord Proprietary;—because, if it were a fraud upon the proprietor of *Mountenay's Neck*, or of the community at large, the communication to the Lord Proprietary could not purge the grant of its fraudulent impurity; its only effect could be to render him a *particeps criminis.* But the grant of *Bold Venture* did not perpetrate the semblance of a fraud upon any body. The only rights which the proprietor of *Mountenay's Neck* or the public had, in that which was granted by the patent of *Bold Venture*, are those of piscary and navigation, which remain unimpaired, and as perfect after the grant as they were before. If by the grant a fraud were practised upon the Lord Proprietary, he only, or those subsequently claiming under him, have a right to complain; it lies not in the mouth of the present plaintiffs to set up such a defence. It surely cannot be contended that a fair, *bona fide*, valid grant of 1695 is rendered fraudulent and void by the passage of the act of 1745, ch. 9; and so far from any fraud being perpetrated upon the Lord Proprietary by the grant of *Bold Venture* at the time it was made, it conferred upon him an essential bene-

22      v.6

fit, by giving to him the full price of valuable land, for that which, at the time, was of little or no value.

There is quite as little ground for the plaintiffs' complaint, that the County Court refused to give their seventeenth prayer. The Lord Proprietary had an indubitable right to make the grant of *Bold Venture* as he did. The rights of navigation and fishing being fully preserved, no existing just right of the grantee of *Mountenay's Neck* was lessened or destroyed thereby; and thereof, therefore, the proprietor of *Mountenay's Neck* had no right to complain.

The refusal of the County Court to give the instruction sought by the eighteenth prayer, is entirely approved of. The first objection to the prayer is, that the expediency or necessity for granting it is not sufficiently shown; *non constat*, but that, by continuing the location of the water line of the north-west branch, with its sinuosities, beyond the letter *Z*, the sixth line of *Bold Venture* running its course and distance, might terminate at the river side, according to its calls; or that it might be made to do so, by elongating or shortening the same. But there is another objection to the instruction, which should have caused its rejection by the court. It introduces a novel and extraordinary principle in the ejectment law of *Maryland*, which might lead to endless confusion, uncertainty, and litigation, as to the locations of lands. If to produce accordance between a line and its call, you can change the running of the next preceding line, you may, upon the same principle, change the running of every antecedent line of the tract; and such changes will be in direct conflict with the express terms of the grant, and without any settled rule of law to govern them; but according to the notions of each person interested as to the best or most expedient changes, by which the accordance, he desires, may be effected. Such an innovation upon the sound, safe, principles of the ejectment law of *Maryland* has never received the sanction of this court; nor, it is believed, of any of the judicial tribunals of this State;— nor is it hazarding too much to say, that it is confidently expected that it never will.

In granting the three prayers made by the defendants, the court below merely carried out some of the undeniable rules of our ejectment law, and sustained the principles decided by this court in the case of *Casey's lessee vs. Inloes et al.*

Concurring in the propriety of all that has been done by the County Court in its last trial of this cause, its judgment should be affirmed.

**JUDGMENT AFFIRMED.**