COUNTY COMMISSIONERS OF FREDERICK COUNTY *v.* BOARD OF EDUCATION OF FREDERICK COUNTY

[No. 74, October Term, 1938.]

278

*Decided September 17th, 1938.*

The cause was argued, as of the April Term, before BOND, C. J., URNER, OFFUTT, PARKE, MITCHELL, and SHEHAN, JJ.

*Edward S. Delaplaine* and *Randolph Barton, Jr.,* for the appellant.

*W. Clinton McSherry* and *Leslie N. Coblentz,* for the appellee.

PARKE, J., delivered the opinion of the Court.

The appeal comes from a decree in a cause which was submitted on a special case stated, pursuant to the provisions of section 221 of article 16 of the Code. The Board of Education of Frederick County is the complainant and The County Commissioners of Frederick County is the defendant, and the controversy is over the construction to be given to chapter 258 of the Acts of the General Assembly of Maryland, which became effective on June 1st, 1937.

The statute duly authorized the defendant to borrow a sum of money, which should not exceed $300,000, and to issue and sell its serial coupon bonds to that amount. The proceeds of the sale are dedicated: (1) to the payment of the expenses properly incidental to the issuance of the bonds, and (2) the residue is payable to the complainant, so that (a) as much of the sum of $250,000 as shall be necessary shall be used for the purchase of a site and the erection and equipment of a high school building in Frederick City; and (b) as much of the sum of $30,000 as shall be necessary shall be used for the construction and equipment of an elementary school building for colored pupils; and (c) whatever is left to be expended by the complainant "for emergencies and variations and costs of estimates in these improvements and their equipment", and, secondly, for making improvements and additions which may be required for other public school buildings in Frederick County. This summary is based upon the first five sections of the Act. There is no doubt over the meaning of these sections. The contention arises wholly in reference to section 6, which provides:

"Sec. 6. And be it further enacted, That anything in this Act to the contrary, notwithstanding that in the event any of the projects herein designated to be carried out by the Board of Education of Frederick County in pursuance to the authority herein contained shall not be financially aided by any agency of the United States of America to such an extent that the funds derived for

said project from the proceeds of this bond issue, together with the funds received from said agency, shall not be sufficient to pay the total cost of said project that then the County Commissioners of Frederick County are directed not to issue so much of said bond issue as has herein been allocated to said project."

It is apparent from this section that the General Assembly did not intend the bonds to be issued, which were authorized for the purpose of a project within the Act, unless the proceeds of the issue which were available for the particular project were so financially aided or complemented by an agency of the United States of America as to make the aggregate of the county and federal funds sufficient to pay the total cost of the project.

For some while before the enactment, the Federal Government had in operation an agency known as the "Federal Emergency Administration of Public Works," for the purpose of granting financial aid of the kind anticipated by the statute. As appears by the special case stated, the terms and conditions which this agency had formulated and required in the grants of public funds were in force and effect for some time before, and when the present Act was passed by the General Assembly, in so far as they relate to the applicant's deposit which was required before the agency would advance federal funds, to the amount and manner of acquiring an advance grant, to the time and amounts of the intermediate grants, and to the amount and manner of determining the final grant. So, the statute was drawn with an eye to the aid extended by the federal agencies. Accordingly, after the enactment, the Board of Education of Frederick County applied to the Federal Emergency Administration of Public Works for financial aid in the projects of getting a site, and of constructing and equipping a public high school at Frederick, and of there building and equipping an elementary public school for colored children. There is no question that these structures and equipment were necessary in the interest of the public; and plans and specifications were made by architects, and the prospec-

tive cost of the projects was estimated so far as it was possible for expert knowledge and judgment to calculate and ascertain. The statute makes plain that the conditions prescribed for the operation of the Act are fulfilled by the precedent estimates upon which public construction and improvements normally depend, when, after all major disbursements are made, it is declared that the residue of the fund so raised by the prior issuance of the bonds "shall be expended by the Board of Education first for emergencies and variations and costs of estimates in the specified improvements herein mentioned and for their equipment." Section 3, subsection (3), pp. 492, 493. The estimates must precede the work of construction, otherwise there would be no basis for comparison and, so no "variations" at the completion of the projects. The statutory anticipation of "variations" in the amounts of estimates is proof that the projects would begin and proceed upon a basis of estimated cost.

The statement of facts shows that the complainant applied for a grant of aid from the Federal Emergency Administration of Public Works for the projects here mentioned before the statute in question was passed. After the Federal agency indicated what percentage of the outlay would be supplied by the government, the statute was introduced in the General Assembly and passed. After the statute became effective, the complainant renewed its application; and the federal agency made a formal offer to aid in financing the construction of school buildings, the furnishing of equipment, and the securing of the land for a site, in the amount of forty-five *per centum* of the cost of the projects upon completion, but not to exceed the sum of $245,250. In terms of totals, the estimated cost of the projects was $545,000. Of this amount, the federal agency agreed to grant forty-five per cent. or $245,250, and the complainant undertook to furnish, through the issuance of the bonds of the defendant, fifty-five per cent. or $299,750. After consideration, the complainant accepted the offer, and gave its assurance to the County Commissioners of Frederick County, the de-

fendant, that the sum of $545,000 would be sufficient to complete the projects, and that the complainant would not, under any circumstances, expend more than the total named. On this action, and, after careful consideration, the defendant passed a resolution authorizing the issue of bonds in the sum of $300,000 pursuant to the terms of the Act, and directing its counsel to prepare the appropriate proceedings for the issuance and sale of the bonds. All the necessary conditions for the offer of the bonds for sale were thus fulfilled. It may not be assumed that the bonds will be sold for less than their face or par value. Thus the funds to be derived from the sale of the bonds and the funds to be received from the federal agency, will, within the meaning of the statute as sensibly read, be sufficient to pay the total cost of the projects. Should the offer for the bonds be less than par, so as thereby to make their proceeds, when augmented by the grant of the federal agency, inadequate to pay the total costs of the projects, then the bonds so allocated to the projects may not be issued. Such a situation is not here presented, and is not likely to arise.

It is urged upon the court that this conclusion is unsound, since the promise of the federal agency to pay the amount of the grant agreed is not what the statute requires. The argument is that the terms of the statute exact that the grant must be actually received by the donee in money to the whole and sufficient amount promised before the defendant may issue any bonds.

At the time of the legislation it was known that the imputed statutory requirement was not the customary method of the federal agencies. While this circumstance would not prevent the General Assembly from providing as a condition precedent that the federal money be in hand before bonds could be issued, nor would it control a contrary expression of intention, nevertheless the circumstance is a fact which may be regarded in reaching a sound conclusion where dubious language makes a problem of construction. One of the major objections to the position of the defendant is that it is not reasonable to

require the site to be acquired, the specified buildings to be built and equipped, in order that it be precisely and finally known what the projects will cost, so that it may be determined whether the bonds should be issued. The usual and accredited method is to assure the necessary funds before the public work is undertaken. The local act to be construed adopts this method. The outlay is ascertained by the estimates of experts on adopted plans and specifications and is made certain by contracts for the public work at prices within the amount of the estimates. Thus, with the total cost of the projects so determined, and the amount of the grant of the federal agency known, the defendant County Commissioners would be able to determine if the proceeds of the bonds to be issued in the amount authorized would be sufficient to pay the total costs of the projects. The agreement of the Federal Government or of its authorized federal agency to pay a grant of a specified amount must be assumed to be the equivalent of money in hand, even if the money be paid in instalments as the work progresses. It may not be gratuitously imputed to the General Assembly that an agreement of an empowered federal agency to provide for public works a certain sum of money, if payable *in futuro*, would not constitute financial aid within the meaning of section 6, until the amount of the financial aid promised was lodged in money in the treasury of the county. If such had been the intention of the General Assembly, appropriate language should have been used. Instead of an explicit expression of such an intention, the terms deny this purpose.

The section enacts that the county bonds shall not be issued unless the sum of the available funds are sufficient to pay the total cost of the project. The sources of the funds are, in the words of the statute, the "funds derived for said project from the proceeds of this bond issue together with the funds received from said agency." There can be no "funds derived" from the proceeds of the bond issue to be combined with the "funds received" from the federal agency, until the bonds are sold. Necessarily the

net "proceeds" of the sale of the bond issue which will be applicable to the project must exist before it can be known whether such net proceeds, an uncertain amount, together with the "funds received" from the federal agency, a certain amount, will be sufficient to pay the estimated total cost of the project. The uncertainty in the amount of the net proceeds of the bond issue will exist until such bonds be offered for sale, and the net proceeds thereby made determinable from the price obtained. Since the uncertain must be made certain before the right to issue arises, it is clear that the statute contemplated an offer for sale of the authorized bond issue as a primary and indispensable precedent requisite to the fulfillment of the statute. In other words, an offer for sale of the bonds is an implicit condition precedent to the effective operation of the statute. If, on the offer for sale of the bonds, the sale price is an amount which, when reduced by the payment of the cost of engraving or printing of said bonds and the payment of the cost of advertising authorized by the act, and all other incidental expenses in connection with the issuance of said bonds, is sufficient, together with the promised federal grant, to pay the estimated total cost of the project, the bonds so conditionally offered for sale shall be sold to the parties making the offer and the bonds issued. The construction given is within the letter and gratifies the purpose of the enactment, and prevents the operation of the provisions of the act from being brought to a statutory stalemate. *Ut res magis valeat quam pereat. Simonds v. Walker,* 100 Mass. 112, 113; *Jones v. Gordy,* 169 Md. 173, 184, 180 A. 272; *Merrill v. Military Department,* 152 Md. 474, 477, 478, 136 A. 897; *Brenner v. Brenner,* 127 Md. 189, 193, 96 A. 287; *Cutty v. Carson,* 125 Md. 25, 33, 93 A. 302; *Bond v. Baltimore,* 111 Md. 364, 369, 74 A. 14; *Chesapeake & Ohio Canal Co. v. B. & O. R. Co.,* 4 G. & J. 1, 152; *Wilson v. Inloes,* 6 Gill 121, 154.

It is quite clear that the bonds must be offered for sale and sold before the defendant could accept the grant, which is conditioned on the financial ability of the de-

fendant to pay fifty-five per centum of the total cost of the project. So, it is not reasonable to read into the statute an intention to exact of the federal agency the payment of any part of the grant before the County Commissioners are known to be able to fulfill their obligation through the sale of the bonds. On analysis the language of the statute makes clear that the statute does not fail unless the federal agent pays into the hands of the defendant the amount of the grant before the issue of the bonds. Nor is there in the words of the statute any tenable ground to conclude that funds which are received of the federal agency after the issue of the bonds, whether in the whole amount of the grant or whether in successive instalments until the full sum is realized, are not "the funds received from said agency" within the very language and import of the statute. The fault in the argument to the contrary is that it would give to the phrase of the statute the meaning of "the funds" which *had* been "received from said agency." It has been seen that this meaning is in conflict with the context. Some further consideration may be named. In the language of the statute, "received" is a perfect participle, and has the properties of a verb and adjective. It usually denotes a completion of the action, which may be spoken of as present, past, or future. The participle itself has no tenses and makes no distinction of time. Thus, the phrase may be written with an adjective of time so as to read "together with the" prior (past) or existing (present) or subsequent (future) "funds received from said agency." *Grammar of English Grammar by Goold Brown,* (10th ed.) ch. VII, obs. 5, p. 413. It follows that, when considered apart from the context, the statutory phrase "received from said agency" describes the source of the funds without reference to the particular time of their receipt. If taken alone, it cannot be said that "receive" has reference to past or future funds exclusively, as it has both a past and future aspect. An illustration of this point is the decision in *Collowin v. Dawson* (1851) 10 C. B. 765, 774-776, 138 Eng. Reprint, 302, 306, 307. When

read in connection with the context, it is clear that the intention of the General Assembly was to include the future in the completion of the action, because, within the contemplation of the statute, the fund from the federal agency may be receivable after the issue of the bonds.

As the reasoning and conclusions of the court with respect to the high school and elementary school improvements are equally applicable to them if treated as separate projects, this tribunal, as a matter of convenience, has considered the two projects as constituting one project. The chancellor, however, has drawn his decree on the theory that two projects are involved and decrees separately with respect to the two school projects. The chancellor's decree is in accord with the construction here expressed, and it was affirmed by a *per curiam* order heretofore filed.